# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES MCRITCHIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0890-JTL |
| | ) | |
| MARK ZUCKERBERG, SHERYL K. | ) | |
| SANDBERG, ROBERT M. KIMMITT, | ) | |
| PEGGY ALFORD, MARC L. | ) | |
| ANDREESSEN, ANDREW W. | ) | |
| HOUSTON, NANCY KILLEFER, | ) | |
| TRACY T. TRAVIS, TONY XU, | ) | |
| and META PLATFORMS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION GRANTING MOTION TO DISMISS

Date Submitted: December 20, 2023
Date Decided: April 30, 2024

Kurt M. Heyman, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

David E. Ross, R. Garrett Rice, Holly E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; James N. Kramer, Alexander K. Talarides, ORRICK HERRINGTON & SUTCLIFFE LLP, San Francisco, California; *Attorneys for Defendants*.

**LASTER, V.C.**

Under the standard Delaware formulation, directors owe fiduciary duties to the corporation and its stockholders. Implicitly, the "stockholders" are the stockholders of the specific corporation that the directors serve, i.e., "its" stockholders. The standard Delaware formulation thus contemplates a single-firm model (or firm-specific model) in which directors of a corporation owe duties to the stockholders as investors in that corporation. That point is so basic that no Delaware decisions have felt the need to say it. Fish don't talk about water.[1]

The plaintiff takes a different view. Capitalizing on the word "stockholders," the plaintiff observes that stockholders are investors. The plaintiff then argues that under Modern Portfolio Theory, prudent investors diversify. Therefore, says the plaintiff, the law must operate on the assumption that a corporation's stockholders are diversified. The plaintiff concludes that owing fiduciary duties to the corporation and its stockholders must mean owing duties that run to the corporation and its

---

[1] The old joke goes something like this: Two young fish are swimming along when an older fish passes by going the other way. He nods at them and says, "Morning, boys. How's the water?" The two young fish swim on for a bit, then one of them looks over at the other and asks, "What the heck is water?" David Foster Wallace made a version of the story famous in his 2005 commencement speech at Kenyon College, titled "This is Water." *See* David Foster Wallace, *This is Water: Some Thoughts, Delivered on a Significant Occasion, about Living a Compassionate Life* 3, 4, 8 (2009). As he explains, "The immediate point of the fish story is merely that the most obvious, ubiquitous, important realities are often the ones that are hardest to see and talk about." The firm-specific nature of corporate fiduciaries' duties may qualify. Two of the few legal academics to explore the issue have offered a similar explanation for the lack of meaningful discussion, observing that the firm-specific nature of fiduciary duties may not have received significant academic attention "possibly because [it] is so fundamental to corporate law and corporate governance that it is hardly noticed." Marcel Kahan & Edward Rock, *Systemic Stewardship with Tradeoffs*, 48 J. Corp. L. 497, 509 (2023).

stockholders as diversified equity investors.[2] Furthermore, according to the plaintiff, because the returns that accrue to diversified equity investors should generally track the economy as a whole, complying with fiduciary duties oriented to diversified equity investors must mean managing the corporation based on what would be best for the economy as a whole.

The plaintiff contends that Delaware law currently follows a diversified-investor model. If not, then the plaintiff argues that Delaware law should change. To ameliorate the significance of reorienting Delaware law, the plaintiff proposes a pilot program in which the diversified-investor model applies to systemically significant corporations whose operations have an outsized effect on the economy.

The plaintiff points to Meta Platforms, Inc. ("Meta" or the "Company") as the poster child for a systemically significant firm. The plaintiff has sued the directors, officers, and controller of Meta, claiming that they all breached their duties by managing Meta under a firm-specific model rather than a diversified-investor model. The complaint describes a litany of ways in which Meta's fiduciaries have allegedly managed the corporation to generate firm-specific value at the expense of the economy as a whole. The complaint also points to the concentrated positions that Meta's directors, officers, and controller own in its equity. The plaintiff contends that

_____

[2] The plaintiff embraces a diversified equity model, but investors need not only diversify across equity investments. Advocates for changing the law have identified other possibilities. The plaintiff, however, wants to fit his argument within the linguistic confines of the term "stockholders," so diversified equity investors it is. This decision uses the terms "diversified equity investors" and "diversified investors" interchangeably, recognizing that there could be other definitions of "diversified investors."

those holdings create a conflict of interest for those fiduciaries, meaning that the defendants must prove that their decisions were entirely fair.

The defendants have moved to dismiss the complaint for failing to state a claim on which relief can be granted. They acknowledge that they manage Meta under a firm-specific model. As their defense, they maintain that that is what Delaware law requires.

This decision grants the defendants' motion. The "deep architecture" of Delaware corporate law reveals that directors owe firm-specific fiduciary duties.[3] Numerous Delaware Supreme Court authorities rest on that implicit proposition. So does American corporate law generally, which has taken a firm-specific approach since courts first treated directors as fiduciaries during the first half of the nineteenth century.

The plaintiff has not made a persuasive case for change. At most, he has shown that some academics—primarily from the law and economics school—have assumed that a diversified-investor model is the norm. He has also shown that some investor advocacy organizations would prefer that model.

The plaintiff's principal argument rests on policy. According to the plaintiff, the single-firm model creates pathologies because directors can take actions that are value-promoting for the individual firm but that harm the economy as a whole. In short, the plaintiff has rediscovered the concept of externalities. The classic example

---

[3] Kahan & Rock, *Systemic Stewardship, supra*, at 508.

is pollution. If a firm can generate profits using a process that creates pollution, and if there is no legal mechanism to force the firm to internalize the costs of the pollution, then the firm can profit by polluting.

The plaintiff believes that under a diversified-investor model, the outcome would be different. Directors would conclude that because they owe duties to diversified investors, they must consider the effect of their decisions on the economy as a whole. Because externality-creating activities harm the economy as a whole, directors would have a fiduciary obligation not to pursue them. Not only that, but because directors who own concentrated positions in their firm's stock face a conflict of interest between the interests of firm-specific investors and those of diversified investors, stockholder plaintiffs could challenge decisions that inferably created firm-specific benefits at the expense of the economy. Directors could eliminate that conflict by holding diversified portfolios of shares, at which point their decisions would receive the protection of the business judgment rule. But if the directors held concentrated positions, stockholders could sue, entire fairness would apply, and courts would have to adjudicate whether the directors could prove that their actions did not harm the economy as a whole.

There are reasons to be skeptical. The academic literature indicates that a diversified-investor model has drawbacks of its own, and the case for imposing a different fiduciary model is far from clear.

Still, there is a way to achieve the plaintiff's desired result. Delaware's governance model is flexible enough to accommodate corporations where directors

pursue the interests of diversified investors. The Delaware General Corporation Law (the "DGCL") authorizes private ordering and empowers corporate planners to tailor director duties through provisions in the certificate of incorporation. Using that authority, corporate planners who find the plaintiff's arguments convincing can reorient director duties toward diversified stockholders.

In the face of Delaware Supreme Court precedent that rests implicitly on the single-firm model, it is not reasonably conceivable that Delaware corporate law currently operates on a diversified-investor model. Nor does this court have the freedom to adopt it, even assuming the concept was sound. The complaint is therefore dismissed.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. At this stage of the case, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A. Meta's Business

Meta is the largest social media network in the world. It has four major social media platforms: Facebook, Instagram, Messenger, and WhatsApp. Approximately 3.59 billion people use those platforms every month, and 2.82 billion people use them every day. Those figures represent, respectively, 43% and 35% of the world's population. Users send over 140 billion messages daily on Meta's platforms.

Meta's ubiquity allows the firm to generate spectacular topline revenues and bottom-line profit. In 2021, Meta generated $118 billion in revenue and $39.3 billion in profit. Advertising generates substantially all of Meta's revenues. Meta's ability to

5

sell ads depends on user engagement with its platforms. Higher engagement levels result in users viewing more advertisements and generating more revenue for Meta. For Meta management, engagement is a key metric.

## B.  Meta's Fiduciaries

Meta is a Delaware corporation with two classes of stock. Class A shares trade publicly and carry one vote per share. Class B shares are only held by insiders and carry ten votes per share.

Meta has a nine-member board of directors (the "Board"). The directors are Mark Zuckerberg, Robert Kimmitt, Peggy Alford, Marc Andreessen, Andrew Houston, Nancy Killefer, Sheryl Sandberg, Tracy Travis, and Tony Xu.

Zuckerberg founded Meta and serves as its CEO. Zuckerberg owns shares of Meta common stock worth approximately $67.6 billion. His holdings include 350 million shares of Class B stock. Although his shares comprise only 13.6% of the outstanding equity, they enable Zuckerberg to exercise hard majority control over Meta.

Sandberg served as Meta's Chief Operating Officer. In June 2022, she held about 1.4 million Class A shares worth just under $290 million. Those shares represented about 17% of her net worth at the time. About three-quarters of Sandberg's wealth has come from sales of Meta stock over the years.

Under Meta's stock ownership guidelines, directors must own Meta stock. Employee directors must own shares with a value of at least $4 million, a threshold that Zuckerberg and Sandberg easily clear. Non-employee directors must own shares with a value of at least $750,000.

In November 2016, the Board approved a stock repurchase program that started in January 2017. Every year since then, Meta has repurchased substantial amounts of stock. In 2021, for example, Meta repurchased shares with a market value of more than $44 billion. The repurchases increase the percentage ownership of the remaining stockholders.

The plaintiff alleges that Zuckerberg, Sandberg, and the other Meta directors are concentrated investors. By that, the plaintiff means that they hold a large portion of their wealth in Meta common stock such that they will benefit if Meta outperforms the market.

The plaintiff contends that Zuckerberg is the pivotal concentrated investor at Meta. Because he controls the company, the incentives created by his concentrated ownership stake dominate Meta's direction.

## C. Meta's Diversified Investors

Meta's public stockholders are broadly diversified institutional investors. As of June 2023, institutional investors owned 75% of Meta's publicly traded Class A common stock, with the top five institutional holders owning 28%. Many of the institutions are legally required to diversify.

Diversification comports with Modern Portfolio Theory. Its proponents have demonstrated through mathematical models that investors can increase returns at lower risk by owning a diversified portfolio of securities. For diversified investors, returns primarily track overall market performance, not the performance of individual companies. Over time, market performance should rise and fall with the performance of the economy as a whole. Assuming gross domestic product ("GDP") is

7

a representative measure of the performance of the economy as a whole, a diversified portfolio should rise and fall over time with GDP.

**D. The Divergence Between Concentrated Investors And Diversified Investors**

As noted, the plaintiff contends that Zuckerberg, Sandberg, and the other Meta directors are concentrated investors, meaning that they benefit when Meta outperforms the market. The plaintiff alleges that Meta's other stockholders are diversified investors who benefit when the market as a whole does well.

The plaintiff observes that the interests of concentrated investors and diversified investors can diverge when a company's business generates negative externalities. An externality is simply an effect or consequence of an activity that is not reflected in the cost of the activity. The existence of externalities means that the person engaging in the activity does not fully internalize all of its effects or consequences.

Externalities can be positive or negative. A positive externality confers benefits on third parties, meaning that the person engaging in the activity does not internalize all of the benefits. A company's research and development efforts create positive externalities when the company invents new products that increase the wider level of knowledge in society. Other companies and individuals benefit from the increased knowledge base without having to compensate the inventor. A person who does not internalize all of the benefits of an activity is likely to engage in less of it than is socially desirable. The law can step in with measures designed to address the externality. For research and development efforts, patent rights seek to protect the

8

inventor's discovery so that the inventor will internalize more of the benefits and will be incentivized to do more inventing.

A negative externality does the opposite. It harms third parties, meaning that the person engaging in the activity does not internalize all of the costs and, all else equal, will engage in more of the activity than is socially desirable. A classic example is pollution. The law can step in with measures designed to address the externality, such as through regulation to prohibit the activity, a Pigouvian tax to account for its cost, or subsidies for competing activities that do not generate the externality.

Because a business that generates negative externalities does not internalize their cost, the owners of that business benefit from continuing to create them. Consider a factory that generates a negative externality in the form of pollution. Assume the factory can use a cheaper manufacturing process that generates more pollution or a costlier manufacturing process that generates less pollution. By using the cheaper process, the factory increases its profits. The owners of the factory receive all of the benefits of the increased profits. If the costs of the increased pollution are spread across the surrounding community, the owners may only feel the effects of the pollution to a small extent. The owners have socialized one dimension of the costs of their business, while keeping all of the gains.

The plaintiff contends that Meta's business generates negative externalities. They cite various news reports that followed a whistleblower's disclosure of a cache of internal Meta documents. The articles included a series called *The Facebook Files* that the *The Wall Street Journal* published in September 2021. The plaintiff contends

9

that Zuckerberg has used his control to ensure that Meta maximizes user engagement, which drives Meta's profits, at the expense of user safety.

One article reported that Meta's internal analyses showed that Instagram use correlated with teenage mental health issues. Internal reports noted that increased Instagram use made body image issues worse for one in three teenage girls. Meta decided not to take action because expanding its base of young users was vital to the Company's revenue. More than 40% of Instagram's users were 22 years old and younger, and about 22 million teenagers logged onto Instagram in the U.S. each day, compared with five million teenagers logging into Facebook, where its base of young users had been shrinking for a decade.

Another article detailed how Meta altered the Facebook algorithm to emphasize reshared posts. Meta made the change following a drop in user engagement. Internal memos observed that the change increased engagement but made Facebook "an angrier place" and noted that "[m]isinformation, toxicity, and violent content are inordinately prevalent among reshares."[4] The changes degraded political discourse across Europe and Asia. Zuckerberg refused to implement changes to the algorithm that would reduce those effects at the expense of engagement.

Yet another article revealed that a program called XCheck allowed celebrities to bypass Meta's safety standards. For some celebrities, only Zuckerberg or Sandberg could enforce Meta's safety standards.

---

[4] Compl. ¶ 65.

Still another article reported that drug cartels and human traffickers use Meta's platforms for illegal activities. According to the article, management failed to devote sufficient resources to police its platforms. In some cases, Meta chose not to spend money on the translation services necessary to monitor trafficking.

And still another article described how Meta allowed its platforms to be used as vectors to disseminate misinformation about COVID-19 vaccines. Company personnel recognized that vaccine hesitancy had become rampant on its platforms and had the potential to cause severe societal harm. The plaintiff contends that Meta did not devote meaningful resources to address this problem.

The plaintiff contends that Meta consciously and openly prioritizes company-specific value over harm to the economy and society. Meta's Corporate Governance Guidelines discuss the goal of "enhancing long-term value for Meta shareholders" without discussing the effects of the Company's operations on diversified stockholder portfolios.[5] The Company's risk management strategy focuses on community safety, human rights, and similar concerns, but only if they pose risks to the Company itself. The plaintiff complains that the Board has not established any mandate to monitor or mitigate risks that the Company's operations pose to the economy or diversified stockholders. There are also no parameters for balancing risks that are minor to the Company but material to Meta's diversified stockholders.

---

[5] *Id.* ¶ 33.

The plaintiff also points to Meta's compensation programs, which focus solely on the Company's financial performance, rather than portfolio-based returns to diversified stockholders. The Board provides executives with large grants of equity, which incentivize executives to pursue initiatives that promote Meta's value at the expense of the economy, society, and the portfolios of diversified stockholders.

Finally, the plaintiff points out that at Meta's 2022 annual meeting, the Board opposed four stockholder proposals that focused on the types of harms that negatively impact diversified investment portfolios. One proposal asked the Board to commission and disclose a report on (1) risks created by Company business practices that prioritize internal financial return over healthy social and environmental systems and (2) the manner in which such risks threaten the returns of its diversified shareholders who rely on a productive economy to support their investment portfolios. Another asked Meta to investigate the risks and negative impacts that the Metaverse could cause. A third addressed mental health issues. A fourth sought a report on the effects of Meta's advertising policies and practices.

In opposing the proposals, the Board cited expenditures the Company had made to address those concerns, but the plaintiff observes that the funds deployed for stock buybacks dwarfed those expenditures. For example, the Board highlighted safety expenditures of $5 billion, yet during 2021, the Company had spent $44 billion on stock buybacks.

E.     **This Litigation**

The operative complaint contains three counts. Each count advances the same basic theory of fiduciary breach but names different defendants.

12

Count I contends that the Board members breached their fiduciary duties as directors by managing Meta "in a manner that ignores the interests" of Meta's "diversified" stockholders and "cause[s] harm to [them] while increasing Meta's share price and bottom line."[6] The complaint alleges that the directors failed to consider "how Meta's activities and policies effect society and the economy at large and thus the portfolios of its diversified stockholders."[7] The complaint also alleges that the directors "acted with gross negligence and consciously disregarded the threat posed to the interests of the Company's diversified stockholders as investors."[8] The complaint maintains that the breaches of duty "imposed [costs] on [the] diversified stockholders' investment portfolios," thereby causing harm.[9]

Count II contends that Zuckerberg and Sandberg breached their fiduciary duties as officers by causing Meta to engage in "activity that threatened the value of the diversified portfolios of the Company's stockholders."[10]

Count III asserts that Zuckerberg breached his fiduciary duties as a controller by causing Meta to engage in the same practices.[11]

---

[6] *Id.* ¶ 157.

[7] *Id.* ¶166.

[8] *Id.* ¶ 158.

[9] *Id.* ¶ 49.

[10] *Id.* ¶ 173.

[11] *Id.* ¶¶ 176, 178.

13

Through those counts, the plaintiff contends that all three groups of Meta fiduciaries have breached their duties: (i) the Meta directors, (ii) Zuckerberg and Sandberg as Meta officers, and (iii) Zuckerberg as Meta's controller. By proceeding in this fashion, the plaintiff assumes that the same fiduciary standards apply. That is a debatable proposition.[12] For purposes of analysis, however, this decision accepts it.

---

[12] Consistent with the plaintiff's approach, the Delaware Supreme Court has stated that "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty" and "the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009). And at a high level, that is true. Officers, like directors, plainly owe duties of loyalty and care, and a court can review officer decisions, like director decisions, using the same standards of review. *See id.* (deciding which standard of review applied to officer decision). But the matter is more complicated because officers derive their fiduciary status from two separate sources. Like directors, they are corporate organs whose role in the corporation's internal governance structure finds statutory recognition in the DGCL. *See* 8 *Del. C.* § 142. And like directors, they too exercise corporate power on behalf of the corporation and its stockholders. *Gantler*'s reasoning about fiduciary equivalence applies most clearly to that dimension of an officer's fiduciary obligations. In addition, officers are corporate agents who are subject to common law duties in that capacity. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842–46 (Del. Ch. 2022). As agents, officers owe duties that the directors don't, such as an agent's duty of obedience to comply with directives from the principal or from more senior agents. *See generally Restatement (Third) of Agency* § 8.09 (Am. L. Inst. 2006), Westlaw (database updated March 2024). When the board has made a decision, the duty of obedience may require compliance with that decision, even if the officer might independently have followed a different course. *See Cygnus Opportunity Fund, LLC v. Washington Prime Gp., LLC*, 302 A.3d 430, 448–53 (Del. Ch. 2023) (discussing implications of duty of obedience in the context of the duty of disclosure). Officer duties can also diverge from director duties for purposes of the duty of oversight. *See In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 369–75 (Del. Ch. 2023) (explaining that "officers owe duties of oversight comparable to those of directors," but "that does not mean that the situational application of those duties will be the same."). The plaintiff thus may be incorrect in assuming that a claim for breach of fiduciary duty against an officer naturally tracks the claim against a director.

A similar picture of general alignment plus potential divergence exists for the duties of stockholder controllers. Historically, Delaware cases have equated the duties of stockholder controllers with those of directors. *See Singer v. Magnavox Co.*, 380 A.2d 969, 976–77 (Del. 1977) ("It is settled Delaware law, for example, that corporate officers and directors and controlling shareholders owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness." (citations omitted)), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (rejecting

For simplicity, this decision analyzes the claim against Meta's directors. Under the plaintiff's construct, the same analysis applies to the other fiduciary defendants.

## II. LEGAL ANALYSIS

The defendants have moved for dismissal under Rule 12(b)(6). When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the

---

business purpose test); *Singer*, 380 A.2d at 977 (quoting formulation of duty of loyalty from *Guth v. Luft, Inc.*, 5 A.2d 503, 510 (Del. 1939), and stating: "While that comment was about directors, the spirit of the definition is equally applicable to a majority stockholder in any context in which the law imposes a fiduciary duty on that stockholder for the benefit of minority stockholders. We so hold."); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952) ("Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts."). When a stockholder controller exercises board-level control, takes over the corporate machinery, and effectively substitutes its wishes for those of the board of directors, then the proposition of fiduciary equivalence is accurate. But a careful review of Delaware precedent indicates that stockholder controllers do not always owe the same duties as directors. *See In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 504–19 (Del. Ch. 2024). For example, when a stockholder controller negotiates an interested transaction opposite a majority independent board or an independent committee, the stockholder controller does not owe a duty of care. The stockholder controller also does not have a duty to ensure that the transaction is the best alternative available for the controlled corporation and its stockholders. The directors owe those obligations. The stockholder controller only has an obligation of non-harm, manifested in the requirement to ensure that the minority stockholders receive the substantial equivalent of what they had before. *Id.* at 521. And when a stockholder controller exercises stockholder-level rights, the stockholder controller owes a duty not to harm the corporation or its minority stockholders knowingly or through grossly negligent conduct. *Id.* at 512. The plaintiff thus may be incorrect again in assuming that a claim for breach of fiduciary duty against a stockholder controller naturally tracks the claim against a director.

15

plaintiff. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[13]

The plaintiff contends that Meta's directors breached their fiduciary duties by making decisions that benefitted concentrated investors rather than diversified investors. The plaintiff further argues that because Meta's directors owned concentrated holdings of Meta common stock, they faced a conflict of interest that subjects their decisions to review under the entire fairness standard.

Those two arguments implicate the distinction between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care.[14] The standard of review is the test that a court applies to the facts of the case to determine whether the directors have met the standard of conduct.[15] Although Delaware decisions traditionally did not acknowledge the distinction,[16] Delaware

---

[13] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[14] *See In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* Julian Velasco, *Shareholder Ownership and Primacy*, 2010 U. Ill. L. Rev. 897, 950 (2010) ("The standard of conduct is primary. It sets forth the director's obligations. The standard of review merely determines how the fiduciary duty will be enforced. Thus, it is secondary and instrumental."); Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 437 (1993) ("A standard of conduct states how an actor should conduct a given activity or play a given role. A standard of review states the test a court should apply when it reviews an actor's conduct to determine whether to impose liability or grant injunctive relief.").

[15] *See Trados II*, 73 A.3d at 35–36.

[16] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018).

jurists now do so openly to explain the divergence between the normative framing of what fiduciary duties require and the practical application of those requirements to the facts of a case.[17]

The distinction between the standard of conduct and the standard of review helps frame answers to the questions that Justice Felix Frankfurter famously posed after observing that to say that someone is a fiduciary "only begins [the] analysis."[18] To give context to the fiduciary relationship, a court must ask additional questions: "To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?"[19] The first two questions find their answers in the standard of conduct. The third question finds its answer in the standard of review. The fourth question finds its answer in the law governing remedies.

---

[17] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Chen v. Howard-Anderson*, 87 A.3d 648, 666–67 (Del. Ch. 2014) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 n.63 (Del. Ch. 2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[18] *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943).

[19] *Id.* at 86.

At the motion to dismiss stage, a court generally need not consider potential remedies.[20] To state a claim on which relief can be granted, however, the plaintiff must have reasonably conceivable answers to Justice Frankfurter's first three questions. It must be reasonably conceivable that (i) the plaintiff is someone for whom the defendant is a fiduciary (or someone able to bring a claim on the beneficiary's behalf), (ii) the defendant owed an enforceable fiduciary obligation, and (iii) the defendant breached that obligation under the applicable standard of review.

In this case, the plaintiff's arguments rise or fall on the standard of conduct. The plaintiff contends that Meta's directors owe fiduciary duties to stockholders in their capacities as diversified investors. The complaint alleges facts demonstrating that Meta's directors have sought to promote the value of the corporation for the benefit of the corporation's stockholders as holders of stock in Meta, not as diversified investors. The complaint alleges facts demonstrating that Meta's directors hold concentrated positions in Meta's common stock such that, if common stock ownership could create a conflict, then Meta's directors would have to show that their decisions were entirely fair. Thus, if the plaintiff is correct that Meta's directors must manage the business and affairs of the corporation for the benefit of diversified investors, not

---

[20] *See Palkon v. Maffei*, — A.3d —, —, —, 2024 WL 678204, at *21 & n.98 (Del. Ch. Feb. 20, 2024) ("A Rule 12(b)(6) motion challenges whether a plaintiff has stated a claim on which relief could be granted. The motion does not target the types of relief that a plaintiff might obtain. A court determines remedies after trial, so a pleading-stage assessment is usually premature." (collecting authorities)). That said, a court may choose to rule at the pleading stage on whether a remedy will be available when doing so will simplify the case or help formulate the issues for trial. Both are important parts of the trial court's case-management function. *Id.* & n.99 (collecting authorities).

firm-specific investors, then the plaintiff has stated a claim on which relief can be granted. If, by contrast, Meta's directors must manage the business and affairs of the corporation for the benefit of diversified investors, not firm-specific investors, then the claim dissolves.

## A.   Delaware Follows A Single-Firm Model.

Delaware corporate law starts from the bedrock principle that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[21] That statutory grant of authority forms the foundation of Delaware's board-centric model of governance.[22] The board's possession of nigh-plenary authority under Section 141(a) "carries with it certain fundamental fiduciary

---

[21] 8 *Del. C.* § 141(a).

[22] *E.g.*, *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291–92 (Del. 1998) ("One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation . . . . Section 141(a) . . . confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation." (footnotes omitted)); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 41–42 (Del. 1994) ("The General Corporation Law of the State of Delaware . . . and the decisions of this Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953 (Del. 1985) ("The board has a large reservoir of authority upon which to draw. Its duties and responsibilities proceed from the inherent powers conferred by 8 *Del. C.* § 141(a), respecting management of the corporations 'business and affairs.'"); *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("The bedrock of the General Corporation Law of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board."); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."). The subsequent history of *Pogostin* and *Aronson* is convoluted. For reasons explained at length elsewhere, this decision omits it. *See, e.g.*, *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 n.1 (explaining subsequent history), *aff'd*, 262 A.3d 1034 (Del. 2021).

19

obligations to the corporation and its shareholders."[23] Thus, in the standard Delaware formulation, the directors' fiduciary duties run to the corporation and its stockholders.[24] The "its" refers to the stockholders of that corporation—a single-firm model.

---

[23] *Aronson*, 473 A.2d at 811; *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. Accordingly, fiduciary duties are imposed upon the directors to regulate their conduct when they perform that function." (footnotes & quotation marks omitted.)); *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006) ("The legal responsibility to manage the business of the corporation for the benefit of the stockholder owners is conferred on the board of directors by statute. The common law imposes fiduciary duties upon the directors of Delaware corporations to constrain their conduct when discharging that statutory responsibility." (footnotes omitted)); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("The board of directors has the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. Accordingly, fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they discharge that function." (footnotes omitted)); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) ("Our starting point is the fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors. 8 *Del. C.* § 141(a). In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."), *decision modified on reargument on other grounds*, 636 A.2d 956 (Del. 1994); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del. C.* § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) ("The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors. 8 *Del. C.* § 141(a). In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (footnote omitted)); *see also Quickturn*, 721 A.2d at 1291 (citing the board's "statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate").

[24] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17 (Del. Ch. Apr. 14, 2017); *accord Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) ("Directors of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders."); *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010) ("The Company's directors, at the time of the decision to redeem owed fiduciary duties to the corporation and its stockholders."); *Schoon v. Smith*, 953 A.2d 196, 206 (Del. 2008) ("In discharging their management function, directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (cleaned up)); *Gheewalla*, 930 A.2d at 99 ("It is well established that

### 1. The Word "Stockholders" And Four Inapposite Cases Do Not Support A Diversified-Investor Model.

The plaintiff hitches its wagon to the word "stockholders."[25] The plaintiff points out that stockholders are investors, then observes that "[s]mart investors diversify."[26] Therefore, says the plaintiff, managing a corporation for the ultimate benefit of its stockholders must mean managing it for the benefit of diversified investors. The plaintiff next argues that "[f]or a diversified Meta stockholder, the critical factor determining financial return will not be how Meta or any other individual company performs ('alpha'), but rather how the market performs as a whole ('beta')."[27] The

---

the directors owe their fiduciary obligations to the corporation and its shareholders."); *Quickturn*, 721 A.2d at 1292 ("In discharging the statutory mandate of Section 141(a), the directors have a fiduciary duty to the corporation and its shareholders."); *Mills*, 559 A.2d at 1280 ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders."); *see Cede*, 634 A.2d at 367 ("Duty of care and duty of loyalty are the traditional hallmarks of a fiduciary who endeavors to act in the service of a corporation and its stockholders."); *Unocal*, 493 A.2d at 955 (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders").

[25] As an aside, the DGCL consistently uses the term "stockholder," making that the correct term for a Delaware corporation. *See generally In re Adams Golf S'holder Litig.*, C.A. No. 7354 (Del. Ch. Oct. 3, 2012) (Laster, V.C.) (TRANSCRIPT). The Model Business Corporation Act (the "MBCA") uses the term shareholder, making that the appropriate term for states that follow the MBCA. That said, the terms are functionally interchangeable, and Delaware decisions have used both terms.

[26] PAB 24 (citing Burton G. Malkiel, *A Random Walk Down Wall Street* (11th ed. 2016)).

[27] PAB 28. As the plaintiff notes, this usage of "beta" differs from its technical meaning as a financial input that measures the difference between overall market volatility and the volatility of an individual security. *Id.* n.10. Appraisal decisions frequently use the term "beta" in its technical sense. According to the plaintiff, "literature describing the importance of overall market returns to investors uses the term to contrast market return with alpha, the individual security return." *Id.* Because that usage may confuse those familiar with

21

plaintiff asserts that over time, a diversified investor's portfolio will track the returns from the market as a whole. Not only that, but market returns will generally track the performance of the economy itself. "While valuation multiples rise and fall, they revert to a mean, leaving GDP as the key determinant of diversified portfolio value."[28]

Other than a gloss on the word "stockholders," the plaintiff offers scant support for this radical claim. The plaintiff cites only three Delaware cases. One is *Revlon*, which this opinion discusses in detail.[29] That decision squarely supports a firm-specific model, not a diversified-investor model.

The second is *Theodora Holding Corp. v. Henderson*, where this court held that a corporation could make a charitable contribution because the directors rationally believed that it would promote the value of the firm for the benefit of the corporation and its stockholders.[30] That case confirms that fiduciary duties run to the corporation for the benefit of its firm-specific stockholders. It does not support a diversified-investor model.

---

corporate finance principles and Delaware appraisal decisions, this decision strives to avoid using the plaintiff's concept of "beta."

[28] PAB 29 (citing Principles for Resp. Inv. & U.N. Env't Programme Fin. Initiative, *Universal Ownership: Why Environmental Externalities Matter to Institutional Investors* 59 (2011), https://www.unepfi.org/fileadmin/documents/universal_ownership_full.pdf.

[29] *See infra* Part II.A.2.a.ii.

[30] 257 A.2d 398 (Del. Ch. 1969).

The third is a transcript ruling from *Allen v. El Paso Pipeline GP Co., L.L.C.*, a limited partnership case.[31] The limited partnership agreement eliminated all fiduciary duties and required that interested transactions be fair to the partnership. The plaintiff challenged an interested transaction as unfair to the limited partners. At the pleading stage, this court declined to rule definitively on whether the contractual standard applied.[32] The court later held that the limited partnership agreement only required a subjective belief that proceeding with an interested transaction was in the best interest of the partnership.[33] That case did not involve a corporation, did not involve fiduciary duties, and ultimately came out against the plaintiff's position.[34]

Outside of Delaware, the plaintiff has found one case in which a court referenced stockholder diversification. In *Joy v. North*,[35] a board acquiesced in a

---

[31] C.A No. 7520, at 41 (Del. Ch. Nov. 5, 2012) (Strine, C.) (TRANSCRIPT).

[32] *Id.* at 41 ("[A]t a pleading stage, it's difficult to say 'Ah, that special committee was just there to look at some abstraction called the partnership. And if it believed that the transaction was unfair to the limited partners of the limited partnership, it could approve it as long as at some abstract level the transaction was, in their mind, fair.'").

[33] *Allen v. El Paso Pipeline GP Co., L.L.C,* 113 A.3d 167, 178–81 (Del. Ch. 2014).

[34] Not only that, but in a subsequent decision interpreting a similar provision in a different limited partnership agreement, this court explained that "[a] transaction that is in the best interests of the Partnership logically should not be highly unfair to the limited partners." *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *4 (Del. Ch. Feb. 20, 2018) (ORDER) (internal quotation mark omitted) (quoting *El Paso Pipeline*, 113 A.3d at 181). The context of that statement makes clear that the court was referring to firm-specific limited partners, not limited partners as diversified investors. *See id.* Thus, even that line of authority eventually leads back to a firm-specific model.

[35] 692 F.2d 880 (2d Cir. 1982).

series of loans to a real estate developer that ultimately exceeded the legal limit for a single borrower. Although there were red flags that the borrower was in trouble, the bank continued to lend additional funds. When a plaintiff sued derivatively, the board formed a special litigation committee, and the committee sought dismissal. The district court granted dismissal. Writing for the United States Court of Appeals for the Second Circuit, Judge Ralph K. Winter explained why the business judgment rule generally protects director decisions from challenge. Those justifications included the ability of stockholders to,

> reduce the volatility of risk by diversifying their holdings. In the case of the diversified shareholder, the seemingly more risky alternatives may well be the best choice since great losses in some stocks will over time be offset by even greater gains in others. Given mutual funds and similar forms of diversified investment, courts need not bend over backwards to give special protection to shareholders who refuse to reduce the volatility of risk by not diversifying. A rule which penalizes the choice of seemingly riskier alternatives thus may not be in the interest of shareholders generally.[36]

The *Joy* case did not point to diversified investors as the focal point for director duties. The court merely referenced the ability of stockholders to reduce the volatility of risk by diversifying as a reason for business judgment rule deference. Moreover, based on the facts of the case, the court rejected the special litigation committee's recommendation. The court held that the plaintiff's chances of success in the underlying case were "rather high," that the damages recovery could be significant,

---

[36] *Id.* at 886 (footnotes omitted).

and that the committee had unreasonably discounted both factors.[37] The *Joy* case

proceeded precisely because the directors had breached their firm-specific duties to

the corporation and its stockholders.

That is remarkably little law to support the assertion that Delaware law

already follows a diversified-investor model. At the same time, the lack of law is not

surprising, because Delaware law does not follow a diversified-investor model.

## 2. Delaware Decisions Necessarily Imply A Single-Firm Model.

Although no Delaware decision has openly said that Delaware follows a single-

firm model, the Delaware Supreme Court has issued a range of decisions which, by

necessary implication, establish that proposition. Under Delaware law, fiduciary

duties run to firm-specific stockholders in their capacities as firm-specific

stockholders and not in any other capacities they may have.

### a. Cases About Stockholders Versus Stakeholders

The first group of Delaware decisions that imply a firm-specific fiduciary

framework reject arguments that directors owe fiduciary duties to the corporation

and its stakeholders. Those decisions stress that duties run to stockholders in

contexts where the court necessarily means firm-specific stockholders. The decisions

do not so much as hint about duties potentially running to diversified investors.

Moreover, to the extent that the diversified-investor position functions as a proxy for

the economy and society as a whole, that position overlaps with the stakeholder

---

[37] *Id.* at 894–97.

position. The first group of decisions rejects the stakeholder position, implicitly rejecting the diversified-investor position.

### i. *Unocal*

The Delaware Supreme Court first addressed the stockholder-versus-stakeholder issue explicitly in *Unocal*, a landmark decision from the takeover wars of the 1980s.[38] There, Mesa Petroleum Co. announced a hostile tender offer for the shares of Unocal Corporation. Mesa offered to pay $54 per share in cash for sufficient shares to constitute a 51% stake. If the tender offer succeeded, then Mesa intended to complete a back-end merger that would convert the remaining shares into the right to receive junk bonds nominally worth $54 per share.[39] In response, the Unocal board of directors resolved that if Mesa acquired a 51% stake, then Unocal would exchange the remaining 49% of its shares for senior debentures with a face value of $72 per share.[40] Mesa claimed that the discriminatory tender offer violated the board's fiduciary duties because (i) it excluded Mesa (which at that point would own the other 51%) and (ii) constituted a self-interested decision because the directors would benefit from the exclusion when they tendered their shares.[41]

---

[38] *Unocal*, 493 A.2d 946.

[39] *Id.* at 949–50.

[40] *Id.* at 951.

[41] *Id.* at 953 ("Mesa contends that the discriminatory exchange offer violates the fiduciary duties Unocal owes it. Mesa argues that because of the Mesa exclusion the business judgment rule is inapplicable, because the directors by tendering their own shares will derive a financial benefit that is not available to *all* Unocal stockholders. Thus, it is Mesa's ultimate contention that Unocal cannot establish that the exchange offer is fair to *all* shareholders,

26

The Delaware Supreme Court analyzed the breach of fiduciary duty claim by first addressing the proper orientation of the directors' fiduciary duties: "[O]ur analysis begins with the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."[42] To repeat, the high court said: "the corporation's stockholders." The justices did not mention stakeholders, nor did they refer to stockholders in other capacities, such as their capacities as diversified investors.

The Delaware Supreme Court then applied that general principle to the specific context of a takeover: "When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders."[43] This time, the high court used the possessive pronoun "its," meaning "the corporation's shareholders." The court again did not refer to duties running to stakeholders, nor did the justices reference stockholders in other capacities, such as their capacities as diversified investors.

Having framed the proper standard of conduct in terms of the best interests of the stockholders of the specific corporation that the directors served, the Delaware Supreme Court turned to the standard of review. To enable a court to evaluate whether the directors were acting properly, the justices created a new standard of

---

and argues that the Court of Chancery was correct in concluding that Unocal was unable to meet this burden.").

[42] *Id.* at 955.

[43] *Id.* at 954.

review: the two-part intermediate standard now known as enhanced scrutiny. The justices established that new standard because they were concerned that in responding to a takeover attempt, "a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders."[44] Thus, from a fiduciary perspective, the directors faced a subtle conflict precisely because they might be considering their own interests in capacities other than as stockholders with an economic interest in the firm.

The first step of the new enhanced scrutiny test required that the directors establish that they were "indeed motivated by a good faith concern for the welfare of the corporation and its stockholders."[45] The directors could make the necessary showing by demonstrating that they responded to "a danger to corporate policy and effectiveness."[46] That element of the test sought to ensure that the directors acted out of "concern for the welfare of the corporation and its stockholders." Once again, the Delaware Supreme Court spoke of "the corporation and *its* [i.e., the corporation's] stockholders." The justices did not speak in terms of stakeholders, nor of stockholders in other capacities, such as diversified investors.

---

[44] *Id.*

[45] *Id.* at 955.

[46] *Id.*

The second step of the new enhanced scrutiny test required that the response selected be "reasonable in relation to the threat posed."[47] In that part of the decision, the Delaware Supreme Court specifically acknowledged that when evaluating the threat and determining the proper response, directors could consider the "inadequacy of the price offered, [the] nature and timing of the offer, questions of illegality, the impact on 'constituencies' other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange."[48] That passage recognized that a threat to the corporate enterprise, and ultimately to the corporation's stockholders, could result from a threat to virtually any corporate constituency. An appropriately tailored response would logically address the specific threat at issue. If, for example, the threat targeted the corporation's employees through a hiring raid, then a board might respond by providing the employees with retention agreements. For purposes of the standard of conduct, however, the proper fiduciary focal point remained a duty "to act in the best interests of the corporation's stockholders."[49]

On the facts of *Unocal*, the Delaware Supreme Court held that the directors acted reasonably when responding to Mesa's coercive tender offer because the

[47] *Id.*

[48] *Id.*

[49] *Id.*

directors concluded in good faith that the fair value of Unocal was approximately $72 per share, substantially above the $54 per share in cash Mesa offered in the front-end tender offer and far above the questionable value of the junk bonds to be provided in the back-end merger.[50] By implementing a selective exchange offer that provided minority stockholders with $72 in value in the form of a debt instrument, the directors responded reasonably to that threat by ensuring that the minority stockholders received the "substantial equivalent in value of what [they] had before."[51]

The high court's holding in *Unocal* thus examined only the stockholders' economic interests in Unocal itself, not their potential interests in any other capacities. The *Unocal* court did not consider the additional interests that some stockholders might have had as employees, nor their potential interests as users of the petroleum products that Unocal produced. The *Unocal* court gave no indication that the directors should consider the interests of stockholders as diversified investors whose interests were aligned with the economy as a whole. If that had been the proper fiduciary orientation, then the Delaware Supreme Court might have evaluated whether the directors considered economy-wide factors, such as whether it would be better for the economy if Unocal remained independent rather than being acquired in a leveraged takeover.

---

[50] *Id.* at 956–57.

[51] *Id.* at 956.

Instead, the *Unocal* decision looked only to the stockholders' economic interests as investors in Unocal. To give the plaintiff his due, the Delaware Supreme Court nowhere used the words "firm-specific stockholders," but that is the obvious import of the decision.

### ii.    *Revlon*

Eight months after *Unocal*, the Delaware Supreme Court issued its equally significant decision in *Revlon*.[52] The dispute began when Ron Perelman, the controller of Pantry Pride, approached Michel Bergerac, the CEO of Revlon, Inc., about a friendly deal. Bergerac rejected the overture, and the board adopted a stockholder rights plan. Pantry Pride then launched a hostile tender offer at $47.50 per share in cash. The Revlon directors responded by approving a self-tender offer in which up to 10 million shares of common stock would be exchanged for senior subordinated notes with a face value of $47.50, paying 11.75% interest per annum, plus one-tenth of a share of preferred stock. Revlon stockholders tendered 33 million shares, representing approximately 87% of the outstanding stock. The company accepted the full 10 million shares on a pro rata basis. Assuming each tendering stockholder tendered all of their shares, that outcome implies that each received notes for approximately 30% of its shares, while retaining the other 70% of its shares. At a

---

[52] *Revlon*, 506 A.2d 173.

minimum, the 30% take-up rate indicates that none of the tendering stockholders were able to exchange all of their shares.[53]

Next, Pantry Pride bumped its offer to $53 per share. Meanwhile, after soliciting interest from a handful of potential buyers, the Revlon board unanimously approved an offer from Forstmann Little & Co., a private equity firm, to acquire Revlon for $53 per share. After learning about Forstmann's bid, Pantry Pride increased its offer to $56.25 per share and announced that it would engage in fractional bidding to top any deal with Forstmann. The Revlon board nevertheless approved a merger agreement with Forstmann at $57.25 per share, conditioned on a crown-jewel asset lockup, a no-shop provision, and a termination fee. In return, Forstmann agreed to support the par value of the notes, whose value had fallen in the market, by making an exchange offer for new notes.[54] Pantry Pride sued, contending that the Revlon directors breached their fiduciary duties to stockholders by agreeing to the Forstmann offer.

As in *Unocal*, the Delaware Supreme Court began by stressing that "directors owe fiduciary duties of care and loyalty to the corporation and its shareholders."[55] As in *Unocal*, the justices referred to the corporation and "its" (i.e., the corporation's)

---

[53] *Id.* at 177.

[54] *Id.* at 178–79

[55] *Id.* at 179.

stockholders. They did not suggest that the court was using that term to mean anything other than the stockholders of Revlon itself.

The Delaware Supreme Court used the new *Unocal* standard of enhanced scrutiny to evaluate the Revlon board's compliance with its duties. The justices held that the board initially responded properly to a legitimate threat posed by Pantry Pride's undervalued bid and acted reasonably when adopting the rights plan and the debt-for-equity exchange offer.[56]

But when the board resolved to approve Forstmann's offer even after Pantry Pride increased its bid, the Revlon board lost the thread. By approving Forstmann's offer, the directors demonstrated that the value achievable in a sale exceeded the directors' assessment of the value of Revlon as an independent entity. That determination in turn affected the degree to which the directors could validly consider the long-term value of Revlon and the threat posed to the many constituencies that contributed to that value. In ringing words that became the principal legacy of the decision, the Delaware Supreme Court stated:

> The duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. This significantly altered the board's responsibilities under the *Unocal* standards. It no longer faced threats to corporate policy and effectiveness, or to the stockholders' interests, from a grossly inadequate bid. The whole question of defensive measures became moot. The directors' role changed from defenders of the

---

[56] *Id.* at 180–82.

corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company.[57]

Framed in more pedestrian language, the directors' duties ran to the firm for the ultimate benefit of the stockholders, so the directors' acknowledgment that the stockholders could do better if the firm were sold meant that the directors' duties obligated them to maximize the value stockholders could obtain in a transaction. At that point, "obtaining the highest price for the benefit of the stockholders should have been the central theme guiding director action."[58]

Instead, the directors breached their duties by agreeing to a transaction with Forstmann based in part on his agreement to support the value of the notes. The Delaware Supreme Court explained that the directors improperly "made support of the Notes an integral part of the company's dealings with Forstmann, even though their primary responsibility at this stage was to the equity owners."[59] In other words, the directors breached their duty of loyalty by focusing on the interests of the noteholders at a time when their interests could not reasonably be thought to enhance the value of the corporation for the benefit of its stockholders, because the board had determined that the best alternative for the stockholders was a cash sale.

---

[57] *Id.* at 182.

[58] *Id.*

[59] *Id.*

The directors argued in response that they properly considered the interests of the noteholders because "*Unocal* permits consideration of other corporate constituencies."[60] The Delaware Supreme Court soundly rejected that contention:

> A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders. However, such concern for non-stockholder interests is inappropriate when an auction among active bidders is in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder.[61]

To reiterate, because Revlon would not continue as a standalone entity, the directors could not legitimately claim that supporting the noteholders would protect the value of the corporation for the ultimate benefit of its stockholders. For a standalone firm, helping creditors might create greater long-term value for stockholders by protecting the firm's ability to access credit markets in the future. Once the directors had recognized that a cash sale maximized value, that consideration no longer mattered.

The Delaware Supreme Court thus held that the Revlon directors breached their duty of loyalty because they failed to act in accordance with the standard of conduct. The duty of loyalty includes a duty of good faith, which requires that directors subjectively seek to maximize the value of the firm for the benefit of its stockholders. But the directors,

> could not make the requisite showing of good faith by preferring the noteholders and ignoring [their] duty of loyalty to the shareholders. The rights of the former already were fixed by contract. The noteholders required no further protection, and when the Revlon board entered into

---

[60] *Id.*

[61] *Id.* (citation omitted).

an auction-ending lock-up agreement with Forstmann on the basis of impermissible considerations at the expense of the shareholders, the directors breached their primary duty of loyalty.[62]

Having identified the precedent breach, the Delaware Supreme Court found it relatively easy to hold that Forstmann could not enforce the deal protection devices he had secured.[63]

Even more clearly than *Unocal*, the *Revlon* decision squarely addressed the proper orientation of a director's duties. The Delaware Supreme Court held that the directors could not properly consider the interests of the noteholders, even though only weeks earlier all of the noteholders had been stockholders, and even though Revlon's pro rata acquisition of 10 million shares out of 33 million tendered made it highly likely that at least some of the noteholders remained stockholders.[64] Yet the Delaware Supreme Court did not contemplate that the directors could consider the interests of the stockholders as investors who also held notes. Nor did the Delaware Supreme Court imply that the directors could consider the interests of stockholders

---

[62] *Id.* (citation omitted).

[63] *Id.* at 183–84.

[64] It is impossible to know for sure. Both shares and notes traded publicly, so some stockholders could have sold their shares and only held notes, some could have sold their notes and only held shares, or new buyers could have acquired notes, shares, or both. But given the structure of the deal, it certainly seems likely that some stockholders were also noteholders. *See* Leo E. Strine, Jr., *Restoration: The Role Stakeholder Governance Must Play in Recreating A Fair and Sustainable American Economy A Reply to Professor Rock*, 76 Bus. Law. 397, 402 (2021) ("So when the Revlon board argued that it was favoring the bidder that would provide the best price for stockholders while protecting the value of the notes, the board knew that many Revlon stockholders now had a Revlon portfolio consisting of both stock and notes, and that they only owned the notes because the board encouraged them to accept them on the promise of value protection.").

in other capacities, whether as diversified investors, as Revlon employees, or as potential users of Revlon beauty products.

The plaintiff takes a different view of *Revlon*, arguing that the case stands for the proposition that directors must "prioritize the interests of stockholders when they diverge from the interests of the corporation as an entity."[65] Generalizing that proposition, the plaintiff argues that "when maximizing the value of the corporation is no longer in the best interests of stockholders, fiduciaries should respond accordingly."[66] The plaintiff concludes that conducting businesses that generate externalities might maximize the value of the corporation, but runs contrary to the interests of diversified stockholders.

That argument assumes that duties run to diversified stockholders. It does not establish that duties run to diversified stockholders. The logic of the *Revlon* decision necessarily implies that duties run to firm-specific stockholders. The Delaware Supreme Court considered whether the directors reasonably concluded that the Forstmann transaction maximized value for Revlon's stockholders in their capacity as stockholders of Revlon. The Delaware Supreme Court held that the directors breached their duty of loyalty because they subjectively sought to benefit another constituency—the noteholders—even though many of those noteholders were inferably also stockholders. The same reasoning would have applied to the extent the

---

[65] PAB 22.

[66] *Id.* 23.

directors considered the stockholders' interests in capacities other than as *Revlon* stockholders, such as their interests as diversified investors. The *Revlon* decision rejects, rather than supports, the plaintiff's core point.

Like *Unocal*, the *Revlon* decision looked only to the stockholders' economic interests as investors in Revlon. To again give the plaintiff his due, the Delaware Supreme Court nowhere used the words "firm-specific stockholders," but that is what the opinion meant. The decision applied a firm-specific model.

### iii. *Gheewalla*

More recently, in the first decade of the current millennium, the Delaware Supreme Court revisited the stockholder-versus-stakeholder issue in *Gheewalla*.[67] There, a corporate creditor sought to bring a direct action against the company's directors for breach of fiduciary duty. The plaintiff argued that the corporation had been insolvent or in the zone of insolvency at all relevant times and that the directors had breached their duties to the corporation by "favor[ing the stockholders'] agenda."[68] Relying on Chancellor Allen's decision in *Credit Lyonnais*, the plaintiff argued that "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise."[69]

---

[67] 930 A.2d 92.

[68] *Id.* at 93.

[69] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991)

The Delaware Supreme Court rejected that contention, holding that the directors of a solvent corporation only owe fiduciary duties to the corporation and its stockholders:

> It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. . . . Accordingly, the general rule is that directors do not owe creditors duties beyond the relevant contractual terms.
>
> . . . .
>
> When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners.[70]

---

[70] *Gheewalla*, 930 A.2d at 99–101 (internal quotation marks omitted) (footnotes omitted). The reference to "shareholder owners" in *Gheewalla* could be misconstrued. Stockholders in a Delaware corporation do not "own" the corporation in the same sense as an owner of land held in fee simple absolute. Charles Korsmo & Minor Myers, *What Do Stockholders Own? The Rise of the Trading Price Paradigm in Corporate Law*, 47 J. Corp. L. 389, 397 (2022). "After all, nobody owns the corporation the way a person owns, say, a pair of trousers." *Id.* Delaware law instead treats the stockholders in the aggregate as the equitable owners of the corporation and its assets. *See J. D. P. v. F. J. H.*, 399 A.2d 207, 210 n.1 (Del. 1979) ("The stockholders are the equitable owners of the property and assets of the corporation . . . ."); *Waldman v. Miller-Wohl Co.*, 28 A.2d 148, 153 (Del. Super. 1942) ("The stockholders of a corporation are the equitable owners of its assets. They have a well-defined interest in its present and future welfare, including its entire policy of operation." (cleaned up)); *Harden v. E. States Pub. Serv. Co.*, 122 A. 705, 706–07 (Del. Ch. 1923) ("The stockholders, however, who are to be regarded as the ultimate beneficial owners of the corporate assets, have an interest therein which equity in a proper case will protect. It is the duty of the corporation itself to proceed to redress the wrongs done to it and thus mediately to safeguard the interests of its stockholders."); *see also Paladini v. Flink*, 26 F.2d 21, 23 (9th Cir. 1928) ("[T]echnically speaking, stockholders are not owners; but, in a broad popular sense, and for certain purposes in a legal sense, they are sometimes so regarded."), *aff'd*, 279 U.S. 59 (1929); *Lynch v. Turrish*, 236 F. 653, 656 (8th Cir. 1916) ("It is true that a corporation holds the legal title of, and the right to manage, control, and convey, its property, and that a stockholder is without that title and right. But, after all, the corporation is nothing but the hand or tool of the stockholders, in which they hold its property for their benefit. They are the equitable and beneficial owners of all its property, and it is the mere holder and manager of it for them."), *aff'd*, 247 U.S. 221 (1918). The stockholders in the aggregate are the equitable owners of the corporation in that they collectively hold the residual claim: once all other

Thus, even in the vicinity of insolvency, the directors remained obligated to strive to increase the value of the corporation for the ultimate benefit of its stockholders.[71]

---

claims have been satisfied, whatever is left goes to them. *See also* Velasco, *supra*, at 952–53 ("The central tenet of the traditional view is that the shareholders own the corporation. This view is widely held outside of the academy because it is fairly obvious. Businesses have owners: sole proprietorships have one owner; partnerships have multiple owners. Corporations may have as few as one owner, but may have many thousands. The form of business organization is a legal technicality; there is nothing in it that necessarily affects ownership. Thus, the corporation is capable of being owned if the law says it is. And it would be anomalous for the law to say otherwise."). Other Delaware decisions, such as *Malone* and *Unocal*, refer to stockholders as "owners" in the same equitable sense. *See Malone*, 722 A.2d at 9 ("One of the fundamental tenets of Delaware corporate law provides for a separation of control and ownership. The board of directors has the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners."); *Unocal*, 493 A.2d at 955 ("As we have noted, [the directors'] duty of care extends to protecting the corporation and its owners from perceived harm whether a threat originates from third parties or other shareholders.").

[71] Other Delaware decisions confirm that the directors of a solvent corporation do not owe fiduciary duties to corporate creditors, including holders of convertible debentures that could be exchanged for equity. *See Simons v. Cogan*, 549 A.2d 300, 304 (Del. 1988) ("Until the debenture is converted into stock the convertible debenture holder acquires no equitable interest, and remains a creditor of the corporation whose interests are protected by the contractual terms of the indenture."); *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 85–86 (Del. Ch. 2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative . . . . [I]t would appear that no transaction could have been worse for the unit holders and reasonable to infer . . . that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors."); *see also Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191–98 (Del. Ch. 2006) (applying business judgment rule to dismiss claims that directors of solvent corporation breached their duties by taking action to benefit subsidiary's sole stockholder at the expense of its creditors), *aff'd*, 931 A.2d 438 (Del. 2007) (TABLE); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) (holding that former preferred stockholders who received debentures and a share of common stock were not owed fiduciary duties in their capacity as debenture holders and had only their contractual rights as creditors).

The Delaware Supreme Court also explained that when a corporation becomes insolvent, creditors gain standing to assert derivative claims, but they do not gain standing to assert direct claims for breach of fiduciary duty.[72] That means that even after the point of insolvency, directors do not owe fiduciary duties to creditors in their capacities as creditors.

Creditors gain standing to assert derivative claims because corporate law grants standing to sue derivatively to the firm's residual claimants. In a solvent corporation, the residual claimants are the common stockholders. That means they receive whatever is left—the residuum—after the corporation pays its fixed claimants in order of priority. But when a corporation is insolvent, the value of the corporation is insufficient to pay all of its fixed claimants and leave a residuum. The residual distribution—in the sense of the last money the corporation has—goes at least partially to pay a class of creditors. Those not-fully-paid creditors therefore enter the class of residual claimants. Because creditors become part of the class of residual claimants, they gain standing to sue, including the ability to assert that the directors took action that breached their fiduciary duties to the corporation.[73] They cannot

---

[72] *Gheewalla*, 930 A.2d at 94 ("In this opinion, we hold that the creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors.").

[73] For a simple example with numbers, envision a solvent corporation worth $100. The claims on its value consist of secured debt of $40, mezzanine debt of $10, and unsecured creditors' claims totaling $20. That leaves $30 in left-over (residual) value for equity. Now assume the corporation's value has dropped to $60. The secured debt and the mezzanine debt gets paid with $10 left over. The residuum goes to the unsecured creditors, who have become

claim, however, that the directors breached any duties to the creditors themselves, because creditors never become the beneficiaries of director duties.[74] The same principle applies to holders of other contractual rights against the corporation, be they customers, suppliers, or employees.[75]

Creditors are a prototypical example of a non-stockholder constituency. The *Gheewalla* decision holds plainly that directors do not owe fiduciary duties to non-stockholder constituencies. They owe duties to promote the value of the corporation for the benefit of its stockholders. That means stockholders as firm-specific stockholders, not stockholders in other capacities, such as diversified investors, employees, customers, community members, or creditors.

---

the residual claimants. The stockholders remain residual claimants, but there is not enough residuum for them to share in any recovery.

One can legitimately wonder why all creditors gain standing to sue derivatively at the point of insolvency. Arguably, only the impaired class of creditors should gain standing to sue. But valuation is as much art as science, and the point of insolvency is difficult to perceive in hindsight, much less in real time. It would be all the more difficult to parse between classes of creditors. The all-creditors-gain-standing rule makes sense for purposes of establishing a reasonably administrable rule.

[74] *See Gheewalla*, 930 A.2d at 101–02. *See generally* Velasco, *supra*, at 933 ("[G]iven the independent legal status of the corporation, directors technically owe their fiduciary duties to it. In reality, this duty runs to the beneficial owners, which ordinarily are the shareholders. However, when the company is insolvent, shareholders have no equity in the company and creditors effectively become the beneficial owners.").

[75] *See* Julian Velasco, *The Fundamental Rights of the Shareholder*, 40 U.C. Davis L. Rev. 407, 439 (2006) ("Whether directors are understood as agents, as trustees, or otherwise, the fact that they control the business does not negate the fact that the shareholders are the beneficial owners. Thus, under the traditional view, directors owe fiduciary duties to the shareholders, and only to the shareholders. There is no room for talk of 'stakeholders' or 'other constituencies.' All other parties—creditors, employees, communities—are, simply put, third parties. They are owed no fiduciary duties and have no legitimate role in corporate governance." (footnote omitted)).

### b.     Cases About Stockholders Acting In Other Capacities

A second group of cases involves stockholder plaintiffs who have asserted claims for breach of fiduciary duty against directors who took action that harmed the plaintiffs in a non-stockholder capacity. The Delaware courts consistently reject these claims, strongly implying that a director's duties run only to stockholders in their capacities as residual claimants in the firm the director serves and not to the stockholders in other capacities.

### i.     The Preferred Stock Cases

One set of decisions involves preferred stock. Those cases distinguish between the contractual preferences that the preferred stockholders possess and the rights that they share with common stockholders. If a certificate of incorporation grants a particular class or series of stock special "voting powers, . . . designations, preferences and relative, participating, optional or other special rights" superior to the common stock, then that class or series is known as preferred stock.[76] Those special rights "are contractual in nature."[77] Just as a board does not owe fiduciary duties to other

---

[76] 8 *Del. C.* § 151(a); *see Starring v. Am. Hair & Felt Co.*, 191 A. 887, 890 (Del. Ch. 1937) (Wolcott, C.) ("The term 'preferred stock' is of fairly definite import. There is no difficulty in understanding its general concept. [It] is of course a stock which in relation to other classes enjoys certain defined rights and privileges."), *aff'd*, 2 A.2d 249 (Del.1937).

[77] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009); *accord Rothschild Int'l Corp. v. Liggett Gp., Inc.*, 474 A.2d 133, 136 (Del. 1984) ("[P]referential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation."); *Judah v. Del. Tr. Co.*, 378 A.2d 624, 628 (Del. 1977) ("Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate of incorporation being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders."); *HB Korenvaes Invs., L.P. v. Marriott Corp.*, 1993 WL 205040 (Del. Ch. June 9, 1993), at *5 ("Rights of preferred stock are primarily but not exclusively

contractual claimants, "[a] board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights."[78]

Because the directors' fiduciary duties do not require protecting the preferred stockholders' special preferences or rights, the standard of conduct for directors requires that they focus on promoting the value of the corporation for the benefit of the common stockholders. Consequently, it generally "will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc.*, of preferred stock."[79] That means that "in circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is possible that a director could breach her duty by

---

contractual in nature. . . . [T]o a very large extent, to ask what are the rights of the preferred stock is to ask what are the rights and obligations created contractually by the certificate of designation."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986) (Allen, C.) ("[W]ith respect to matters relating to the preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract.").

[78] *Trados II*, 73 A.3d at 39; *see LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 438 (Del. Ch. 2010) ("[O]nce the QuadraMed Board honored the special contractual rights of the preferred, it was entitled to favor the interests of the common stockholders."); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of stock, such as the Certificates, that are enjoyed solely by the preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *15 ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights.").

[79] *Equity-Linked Invs., L.P. v. Adams*, 705 A.2d 1040, 1042 (Del. Ch. 1997) (Allen, C.).

improperly favoring the interests of the preferred stockholders over those of the common stockholders."[80]

For present purposes, a director's relationship with preferred stockholders resembles a director's relationship to an investor who interacts with the corporation in two separate capacities. One capacity is contractual (reflected by the preferred stockholder's special rights); the other capacity is as a residual claimant (reflected by situations in which the preferred stock occupies the same position as the common). For purposes of the director's fiduciary duties, the director has no obligation to seek to maximize the value of the preferred stockholders' rights as contractual claimants. The directors only owe fiduciary obligations to maximize the value of the corporation to the extent the preferred stockholders participate as residual claimants. By parity of reasoning, the same is true for a common stockholder that also interacts with the firm in other capacities. A director need not consider the stockholder's interests as a

---

[80] *Trados I*, 2009 WL 2225958, at *7 (emphasis omitted); *accord LC Cap.*, 990 A.2d at 447 (quoting *Trados I* and remarking that it "summarized the weight of authority very well."). The reference to fiduciary duties running to the common stockholders is a helpful heuristic, but technically an oversimplification. "By default, 'all stock is created equal.'" *Trados II*, 73 A.3d at 38 (quoting *MCG Cap. Corp.*, 2010 WL 1782271, at *6). If a certificate of incorporation is silent on a particular issue, then as to that issue, the preferred stock and the common stock have the same rights. *Id.* Directors owe fiduciary duties to preferred stockholders "when they do not invoke their special contractual rights and rely on a right shared equally with the common stock." *Id.* at 39–40. For example, just as common stockholders can challenge a disproportionate allocation of merger consideration as a breach of fiduciary duty, so too can preferred stockholders who do not possess and are not limited by a contractual entitlement. *Id.* In that setting, the preferred stockholders are effectively part of a larger stockholder aggregate that includes both the common stock and, as to that issue, the preferred stock. *Id.* Technically, therefore, fiduciary duties run to the corporation for the benefit of stockholders in their capacity as residual claimants, which means the undifferentiated equity as a collective, without regard to any special rights. *Hsu*, 2017 WL 1437308, at *17.

diversified investor, employee, customer, or participant in the economy. A director only needs to consider a stockholder's interests as a residual claimant in the specific firm that the directors serve.

### ii.    The Employee-Status Cases

Two other decisions deal with stockholders who were also contractual claimants in their capacities as former employees. In *Nemec v. Shrader,*[81] a board approved the sale of one of the corporation's two business units in a transaction that would generate approximately $700 per share. Before the transaction closed, the board caused the corporation to exercise a right to redeem shares held by retirees at their book value of $162.46 per share. The redemption increased the total amount of consideration available for other stockholders by $60 million. Two retired executives sued, contending that the corporation breached the implied covenant of good faith and fair dealing by exercising the redemption right and that the directors breached the fiduciary duties they owed to the retired executives as stockholders.

After rejecting the implied covenant claim, the Delaware Supreme Court held that the directors did not owe any fiduciary duties to the retired executives for purposes of the redemption. The redemption right "was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract."[82] For purposes of the redemption right, therefore, the retirees were not part

---

[81] 991 A.2d 1120 (Del. 2010).

[82] *Id.* at 1129.

of the stockholder collective, but were rather contractual counterparties, and the directors did not have to consider their interests in that capacity.[83]

The Delaware Supreme Court addressed a similar issue in *Riblet Products Corp. v. Nagy*.[84] There, three stockholders jointly controlled 85% of the common stock of a Delaware corporation. Ernest Nagy, the corporation's CEO, owned the remaining 15%. The majority stockholders caused the corporation to terminate Nagy for cause because he allegedly engaged in self-dealing. Nagy disputed his termination and sued the corporation in federal district court for breach of his employment agreement. Nagy also sued the majority stockholders, alleging that they breached their duties to him as a minority stockholder by terminating him. After Nagy prevailed at trial on both claims, the United States Court of Appeals for the Seventh Circuit asked the Delaware Supreme Court to address whether Nagy could assert a claim for breach of fiduciary duty based on his termination as an employee. The Delaware Supreme

---

[83] Indeed, it seems likely that under this line of reasoning, the directors could have argued that the exercise of the redemption right was consistent with their fiduciary duties because it increased the total pool of consideration available for the common stockholders in the aggregate. The directors' standard of conduct did not require considering the retirees' interests in any capacity other than as contractual counterparties. But because the corporation could continue to exist, the directors also could have satisfied the standard of conduct if they decided *not* to redeem the retirees shares, as long as they subjectively believed that doing so would promote the value of the corporation over the long-term by enhancing the firm's relationship with its employees, who would see that the firm treated its retirees well and would thus work harder and have longer tenures. On the facts of *Nemec*, the business judgment rule would protect either decision. The directors were not interested in the redemption for the same reason that the Delaware Supreme Court held in *Unocal* that the directors were not interested in the exclusionary self-tender: although they benefitted as stockholders by receiving more consideration, they only benefitted in their capacity as stockholders and to the same degree as other stockholders. *See Unocal*, 493 A.2d at 957–59.

[84] 683 A.2d 37 (Del. 1996).

Court said no, noting that Nagy had "actively and successfully pursued his contractual rights as an employee," but that "[t]hese contractual rights are separate from his rights as a stockholder."[85] The Delaware Supreme Court acknowledged that the majority stockholders owed fiduciary duties to Nagy in his capacity "as a minority stockholder," but held that nothing about his allegations implicated the directors' fiduciary duties.[86] The corporate fiduciaries' duties to Nagy did not require considering his interests in other capacities, such as in his capacity as an employee.

The plaintiff's diversified-investor argument resembles the claims advanced in *Nemec* and *Riblet*, except that rather than seeking to have directors consider their status as employees, the plaintiff wants directors to consider their status as diversified investors. The *Nemec*, and *Riblet* decisions show that directors need not consider a stockholder's other capacities. Directors can consider those other capacities if the directors subjectively believe doing so will enhance the value of the firm for its residual claimants, but those other capacities are not independently part of the fiduciary calculus.

### c. Diversified Investors In Takeover Situations

A vast group of Delaware decisions examines whether directors have complied with their fiduciary duties in M&A scenarios. The central substantive issue is typically whether sell-side directors have breached their fiduciary duties by

---

[85] *Id.* at 40.

[86] *Id.*

approving a challenged transaction. Depending on the standard of review, that question manifests as an inquiry into whether the transaction (i) was fair to the sell-side stockholders (entire fairness), (ii) fell within a range of reasonable results (enhanced scrutiny), or (iii) could have been rationally thought to be in the sell-side stockholders' interests (business judgment rule). Cases conducting that inquiry evaluate to varying degrees (i) what the sell-side directors did to generate the transaction and (ii) the value of the consideration to the sell-side stockholders relative to potential alternatives, including the possibility of remaining independent.

How courts approach that question speaks volumes about the proper orientation of fiduciary duties. If sell-side directors had a duty to consider the interests of diversified stockholders, then one might expect the decisions to evaluate whether the directors properly considered factors relevant to diversified investors. If the acquirer (or topping bidder) were publicly traded, and if the sell-side board had a duty to consider the interests of diversified stockholders, then one would expect courts to consider the extent to which the sell-side directors considered whether the deal would create a positive surplus, regardless of the allocation between the two firms. The takeover premium would not be relevant, because diversified sell-side stockholders could be expected to own shares on the buy side as well. Assuming proportionate ownership, the cost of the premium to the buyer's stockholders would offset the value of the premium to the target stockholders. Courts would ask whether directors considered how successful the combination would be, because diversified

stockholders would benefit from productive combinations and suffer harm from unsuccessful ones.

Judicial analysis would change to a similar degree for cash deals, with courts expecting directors to consider the value of the combination to diversified investors. Under the plaintiff's formulation, that would mean considering the value of the combination to the economy. Courts might expect sell-side directors to consider whether the acquirer planned to take on considerable debt to fund the acquisition, because a bankruptcy could cause economic dislocation. Or courts might expect sell-side directors to resist or reject combinations resulting in excessive market concentration that could harm the economy by enabling the post-combination entity to extract monopoly rents. Courts likewise might expect directors to resist or reject acquisitions by privately held entities, not because those transactions constituted changes of control triggering range-of-reasonableness review under enhanced scrutiny, and not because some of those transactions constituted controller squeeze-outs warranting entire fairness review, but rather because the transactions would reduce the investment options available to diversified investors.

Yet there are no indications that courts expect directors to take those or similar factors into account. No cases suggest directors should consider whether a particular outcome would be harmful or beneficial to the economy. Nor do any cases suggest that sell-side directors should consider the transaction from the perspectives of both sell-side and buy-side stockholders. Quite the opposite.

- In *Paramount Communications, Inc. v. Time Inc.*, neither the Court of Chancery nor the Delaware Supreme Court considered the wisdom of the

50

combination from the perspective of diversified investors, who presumably owned shares in both Time, Inc., Warner Communications, Inc., and Paramount Communications, Inc.[87]

- In *In re Tesla Motors, Inc. Stockholder Litigation*, the Delaware Supreme Court affirmed the Court of Chancery's finding that a stock-for-stock merger was entirely fair to the stockholders of Tesla Inc. without ever considering whether, as diversified investors, the minority also owned shares in Solar City Corporation.[88]

- In *Rosenblatt v. Getty Oil Co.*, the Delaware Supreme Court affirmed the Court of Chancery's finding that a stock-for-stock merger was entirely fair to the minority stockholders of Skelly Oil Company without ever considering whether, as diversified investors, the minority also owned shares in Getty Oil Company.[89]

- In *Air Products & Chemicals, Inc. v. Airgas, Inc.*, the Delaware Court of Chancery upheld the decision of a public company board's decision to reject a premium offer from another public company, without ever considering the benefits or detriments to diversified investors who presumably also owned stock in the buyer.[90]

- In *Citron v. E.I. Du Pont de Nemours & Co.*, the Court of Chancery held that a stock-for-stock merger was entirely fair to the minority stockholders of Remington Arms Company without ever considering whether, as diversified investors, the minority also owned shares in DuPont.[91]

- In *In re Crimson Exploration Inc. Stockholder Litigation*, the Court of Chancery held that it could not infer bad faith from a low 7.7% premium,

---

[87] 571 A.2d 1140 (Del. 1989), *aff'g* 1989 WL 79880 (Del. Ch. July 14, 1989).

[88] 298 A.3d 667 (Del. 2023), *aff'g* 2022 WL 1237185 (Del. Ch. Apr. 27, 2022).

[89] 493 A.2d 929 (Del. 1985), *aff'g* 1983 WL 8936 (Del. Ch. Sept. 19, 1983).

[90] 16 A.3d 48 (Del. Ch. 2011).

[91] 584 A.2d 490 (Del. Ch. 1990).

51

without ever considering whether diversified investors might own shares on the buy side and hence benefit from the low price.[92]

If directors owed duties to diversified investors, then we have curious cases of dogs not barking in the nighttime.[93] But the nights were peaceful for a different reason: Directors only owe fiduciary duties to firm-specific stockholders.

### d. Decisions Addressing Conflicts Of Interest

A final group of Delaware cases addresses conflicts of interest. "Generally, a director or controller is 'interested' in a transaction or conduct involving a corporation if the director or controller is a party to the transaction or conduct or if the director or controller receives a benefit as a result of the transaction or conduct that is not shared pro rata according to the number of shares held."[94] Interestedness is measured based on the degree to which the benefits or detriments to a director deviate from

---

[92] 2014 WL 5449419 (Del. Ch. Oct. 24, 2014); *accord In re MeadWestvaco S'holders Litig.*, 168 A.3d 675 (Del. Ch. 2017); *In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659 (Del. Ch. Apr. 13, 2017).

[93] *See* Sir Arthur Conan Doyle, *Silver Blaze*, in *The Complete Adventures and Memoirs of Sherlock Holmes* 172, 183–84 (1975). In the story, the failure of a watchdog to bark while a racehorse was being stolen led Sherlock Holmes to deduce that the dog knew the thief. In the following sequence, Holmes highlights the incident:

Gregory (Scotland Yard detective): "Is there any other point to which you would wish to draw my attention?"

Holmes: "To the curious incident of the dog in the night-time."

Gregory: "The dog did nothing in the night-time."

Holmes: "That was the curious incident."

[94] Kahan & Rock, *Systemic Stewardship*, *supra*, at 509 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169–70 (Del. 1995)).

those suffered by the stockholders of the specific firm. Interestedness is not measured by a diversified-investors standard.

The implications of common stock ownership present a special case that proves the point. If the plaintiff is correct, then concentrated common stock ownership should create a conflict. Instead, Delaware cases say the opposite. Delaware decisions presume that a director who is also a stockholder is more likely to have interests that align with the best interests of the stockholders as a whole.[95] As then-Vice Chancellor Strine wrote: "[I]t is useful to have directors with, as Ross Perot was wont to say, skin in the game. Such directors have a personal interest in ensuring that the company is

---

[95] *See Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002) ("A director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."); *In re IXC Commc'ns, Inc. v. Cincinnati Bell, Inc.*, 1999 WL 1009174, at *6–7 (Del. Ch. Oct. 27, 1999) (observing that directors with large stock holdings would likely have interests aligned with shareholders); *see also Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1380–81 (Del. 1995) (presuming that directors' economic interests align with their fiduciary duties when they own substantial blocks of stock; rejecting the contrary presumption that "the prestige and perquisites of holding a director's office or a motive to strengthen collective power prevails over a stockholder-director's economic interest"); *In re Pennaco Energy, Inc.*, 787 A.2d 691, 709 (Del. Ch. 2001) ("[T]he board's grant of options to itself on July 28, 2000 was consistent with a policy of aligning the board's interests with those of the stockholders. This is a permissible purpose."); *In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (observing that directors' equity ownership created "powerful economic (and psychological) incentives to get the best available deal"), *aff'd,* 608 A.2d 729 (Del. 1992); *see generally* R. Franklin Balotti, *et al.*, *Equity Ownership and the Duty of Care: Convergence, Revolution, or Evolution?*, 55 Bus. Law. 661, 692 (2000) ("The intuitive and experiential foundations for these principles now find additional support in empirical research that shows that substantial equity holdings in fact promote superior board monitoring and effective corporate decision making. To the extent corporations respond to an equity-based presumption of care by increasing the equity holdings of board members, the result should be improved corporate performance and the creation of greater wealth for the economy as a whole.").

managed to maximize returns to the stockholders."[96] Delaware decisions have also

rejected out of hand arguments that directors' stock options created a conflict, holding

instead that the options aligned the directors' economic interests with their fiduciary

duties.[97]

---

[96] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006); *accord In re Oracle Corp.,* 867 A.2d 904, 930 (Del. Ch. 2004) ("[M]any sophisticated commentators believe that it is a good idea that corporate insiders own company stock because having, as Ross Perot would say, 'skin in the game' will tend to align their interests with those of the public stockholders."), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE).

[97] *Crimson Expl.,* 2014 WL 5449419, at *22 (holding that "to the extent that any of the directors held Crimson shares or options, that fact would tend to align their interests with the common stockholders, not create a conflict"); *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013) ("[T]he Plaintiffs' contention that the vesting of stock options in a change of control transaction implicates the duty of loyalty is frivolous. Delaware courts recognize that stock ownership by decision-makers aligns those decision-makers' interests with stockholder interests; maximizing price. Our Courts have therefore routinely held that an interest in options vesting does not violate the duty of loyalty."); *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *13 n.64 (Del. Ch. Feb. 29, 2012) (rejecting argument that directors were interested due to vesting of stock options because "the directors' interests would be aligned with the shareholders in seeking the highest price for their shares reasonably available"); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) ("The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("The vesting of options does not create a conflict as a high exchange ratio for ProNet shares benefits the option-holding directors as much as, if not more than, the regular stockholders."); *see also In re Toys "R" Us, Inc. S'holder Litig.*, 2005 WL 5756357, at *26 n.42 (Del. Ch. June 24, 2005) ("Commentators on corporate governance have expressed the belief—and Delaware courts have concurred—that stock options, when used and designed prudently, can help align insiders' interests with those of public shareholders, because it gives insiders an incentive to increase the value of the company's shares.").

Those statements are largely true but overly simplistic. Option acceleration confers an additional benefit because the director receives consideration for unvested equity awards that might not vest in the fullness of time. *See, e.g., Tesla Motors*, 2022 WL 1237185, at *4 n.24 (finding that officer's compensation was "nowhere near" the disclosed value because the disclosed value included equity awards and "[t]he overwhelming majority of [those] equity awards, consisting of restricted stock awards and option awards, never vested"). Acceleration also confers an additional benefit because the director receives consideration for the unvested options at closing, rather than at some future date. Because of those benefits, the Court of Chancery has recognized that the acceleration and immediate payout of unvested equity

What often creates a conflict for purposes of a challenged transaction is an economic interest on the other side of the deal, or a lack of independence from someone who has such an interest. Directors who lack independence from a controlling stockholder face a conflict of interest for purposes of a squeeze-out, even if both parties are publicly traded and the transaction creates a positive surplus.[98] If the standard of conduct focused on diversified investors, ownership in both sides of the deal could promote alignment, rather than conflict.

Cases addressing conflicts of interest thus implicitly reject the diversified-stockholder model. They are only consistent with a single-firm model.

### 3. The Historical Arc Of Director Fiduciary Duties Points To A Firm-Specific Model.

As the previous section showed, Delaware cases rest on a foundation of firm-specific fiduciary duties. Looking beyond Delaware and examining the historical arc of director duties confirms the single-firm focus. As Justice Holmes reminded us: "The life of the law has not been logic: it has been experience."[99] Here, experience is a wise teacher. Tracing the development of director duties through time confirms that the

---

awards may confer a material benefit. *See Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at \*13 n.148 (Del. Ch. Jan. 25, 2019), *aff'd*, 237 A.3d 818 (Del. 2020) (TABLE). Option acceleration is thus broadly aligning, particularly for purposes of creating an incentive to get the best price an acquirer will pay, but it can create misalignment regarding whether to approve a deal in the first place. *See Goldstein v. Denner*, 2022 WL 1671006, at \*45–46 (Del. Ch. May 26, 2022).

[98] *E.g.*, *Weinberger*, 457 A.2d at 710.

[99] Oliver Wendell Holmes, *The Common Law* 1 (1881). Today, "theory" might substitute for "logic."

fiduciary orientation has not changed. It started out single-firm focused. It remains single-firm focused.

### a.    The Origins Of Corporate Fiduciary Duties

American courts began to treat directors as fiduciaries in the early nineteenth century, after a critical mass of corporations had emerged and operated long enough to generate governance disputes.[100] In 1817, Chancellor James Kent of New York first acknowledged that stockholders as beneficiaries could charge directors with a breach of trust if the capital they contributed to the company was "not beneficially employed for the interest of the company," although he did not rely on that principle for purposes of his decision.[101] Subsequently, in 1832, Chancellor Reuben H. Walworth— the last Chancellor to occupy that judicial office in the State of New York—held affirmatively that he could exercise jurisdiction in equity over a breach of fiduciary duty by corporate directors.[102] The defendants in that case had obtained a corporate

---

[100] In the years before the American Revolution, few corporations existed: "[L]ess than a dozen for-profit business corporations had been chartered in the American colonies." Harwell Wells, *A Long View of Shareholder Power: From the Antebellum Corporation to the Twenty-First Century*, 67 Fla. L. Rev. 1033, 1040 (2015). After the American Revolution, legislatures began to charter corporations more frequently, and over 300 for-profit corporations existed by 1800. *Id.* During the early nineteenth century, the pace accelerated. From 1801 to 1810, state legislatures chartered 867 business corporations; and in the next decade, 1,477; and by the 1850s, almost 8,000. *Id.* at 1041. These figures are imperfect due to a shortage of data, but they reveal systemic trends. *See id.*

[101] *Att'y Gen. v. Utica Ins. Co.*, 2 Johns. Ch. 371, 385 (N.Y. Ch. 1817).

[102] *Robinson v. Smith*, 3 Paige Ch. 222 (N.Y. Ch. 1832). A smattering of similar rulings arose in other jurisdictions. *See* Ann M. Scarlett, *Shareholder Derivative Litigation's Historical and Normative Foundations*, 61 Buff. L. Rev. 837, 871–73 (2013) (describing decisions). In 1829, the Supreme Court of Louisiana regarded corporate directors as "the agents or mandatories of the stockholders" and held that they were obligated to manage the corporation in accordance with its charter and bylaws and would be responsible "not merely

charter to mine coal. After briefly engaging in the mining business, they used the stockholders' capital to speculate in stocks for "their own individual interests and purposes."[103] Chancellor Walworth held:

> [T]he directors of a moneyed or other joint stock corporation, who willfully abuse their trust or misapply the funds of the company, by which a loss is sustained, are personally liable as trustees to make good their loss. And they are equally liable, if they suffer the corporate funds or property to be lost or wasted by gross negligence and inattention to the duties of their trust.[104]

Both the *Utica Insurance* and the *Robinson* decisions indicated that directors could be liable as fiduciaries for the loss of the funds or property of the corporation they served. The decisions thus envisioned firm-specific duties and potential liability for a firm-specific breach.

Other decisions followed,[105] and in 1855, the Supreme Court of the United States issued its opinion in *Dodge v. Woosley*.[106] There, the justices stated:

> It is now no longer doubted, either in England or the United States, that courts of equity, in both, have a jurisdiction over corporations, at the instance of one or more of their members; to apply preventive remedies

---

for infidelity in the management of the affairs [e]ntrusted to them, but also for *their fault*." *Percy v. Millaudon* 8 Mart. (n.s.) 68, 73–74 (La. 1829). The following year, the Ohio Supreme Court allowed a stockholder to sue the president and directors of a bank for breach of trust and for an accounting, treating the directors as the stockholders' "agents and trustees." *See Taylor v. Miami Exp. Co.*, 5 Ohio 162, 167 (1831).

[103] *Robinson*, 3 Paige Ch. at 231.

[104] *Id.*

[105] *See* Scarlett, *supra*, at 873–82 (citing other cases); Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on Its Derivation*, 32 N.Y.U. L. Rev. 980, 986–91 (1957) (same).

[106] 59 U.S. 331 (1855).

by injunction, to restrain those who administer them from doing acts which would amount to a violation of charters, or to prevent any misapplication of their capitals or profits, which might result in lessening the dividends of stockholders, or the value of their shares, as either may be protected by the franchises of a corporation, if the acts intended to be done create what is in the law denominated a breach of trust.[107]

Like *Robinson*, the *Dodge* decision focused on the loss of firm-specific "capitals or profits, which might result in lessening the dividends of stockholders, or the value of their shares."[108] The *Dodge* decision quickly became a leading case.[109]

Under these early decisions, the directors' fiduciary relationship with stockholders rested on the fact that stockholders entrusted their capital to the firm, which the directors had virtually plenary power to manage.[110] Through the resulting

---

[107] *Id.* at 341.

[108] *Id.*

[109] Wells, *supra*, at 1048.

[110] The concept of entrustment undergirds many fiduciary relationships. Through an entrustment, one person is entrusted with legal authority to act for or on behalf of another in relation to assets or rights of the other. *See* David Kershaw, *The Foundations of Anglo-American Fiduciary Law* 68–92 (2018); David Kershaw, *Delaware's Fiduciary Imagination: Going-Privates and Lord Eldon's Reprise*, 98 Wash. U.L. Rev. 1669, 1674–75 (2021). Entrustment is not the only basis for fiduciary obligation. *See, e.g.*, *Contract, Status, and Fiduciary Law* (Paul B. Miller & Andrew S. Gold eds., 2016); Matthew Conaglen, *Fiduciary Loyalty: Protecting The Due Performance of Non-Fiduciary Duties* (2011); Deborah A. DeMott, *Breach of Fiduciary Duty: On Justifiable Expectations of Loyalty and Their Consequences*, 48 Ariz. L. Rev. 925, *passim* (2006); Tamar Frankel, *Fiduciary Law*, 71 Calf. L. Rev. 795, *passim* (1983); Ernest J. Weinrib, *The Fiduciary Obligation*, 25 U. Toronto L. J. 1, 7 (1975). Delaware, for example, imposes an other-regarding obligation of loyalty in other settings, including settings involving relations of power and vulnerability. *See, e.g.*, *Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689, 690 (Del. Ch. 1973) (noting that a fiduciary relationship can arise "where one person repose special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another" and where "[t]he relationship connotes a dependence" and "a condition of superiority of one of the parties over the other"), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973).

relationship, the directors undertook to strive to grow the stockholders' capital by increasing the value of the firm. The courts focused on potential breaches of trust involving the misuse or misapplication of the firm-specific capital that the stockholders had contributed or the firm-specific profits the firm had generated.

Notably, in this relationship, directors do not become fiduciaries for the stockholders as individuals. The stockholders do not entrust their hopes and dreams to the corporation, nor do they entrust any property or legal rights other than the capital or other consideration contributed in exchange for shares. Each share initially represents a proportionate claim on the aggregate value of the contributed capital. The directors' task is to grow that value by promoting the value of the firm. Over time, each share represents a proportionate claim on the resulting value of the firm.

Technically, under this framework, the directors' duties run to the corporation for the ultimate benefit *of the shares*. Stockholders enter the mix only because shares have owners, and the owners of shares benefit when the value of the firm increases because that value accrues proportionately to the shares. The fact that shares are freely alienable by default means that from the directors' standpoint, the ultimate human beneficiaries of that value are incidental. The obligation is an economic one: care for the capital entrusted to the firm, protect and grow the value of the firm, and thereby increase the value of the shares.

Fiduciary duties thus properly run to the corporation for the benefit of the shares. That makes the resulting fiduciary obligation inherently financial and firm specific. It initially concerns only the stockholders' capital. It only applies to the

capital entrusted to the specific firm. And it subsequently only concerns the growth in the value of the firm that inures to the benefit of the shares.

### b.     The Consistent Application Of Fiduciary Duties

The original understanding of fiduciary duties has never changed. Over the ensuing decades, states shifted from special incorporation to general incorporation, firms shifted from in-state incorporation to interstate incorporation, and corporate law moved from a regulatory model to an enabling model. Those changes revolutionized the statutory underpinnings of the corporation, but they had little effect on the fiduciary relationship. New Jersey initially pioneered all three developments, yet in 1875, the same year that New Jersey began its trail-blazing effort to attract out-of-state charters, the state's highest court held that the directors of a corporation served as fiduciaries for "that company and its stockholders."[111]

When Delaware sought to compete with New Jersey, it did not change the model. Just one year after the enactment of the DGCL, this court held that New Jersey decisions interpreting the New Jersey General Corporation Law "must be followed, regardless of what would otherwise be the judgment of this court."[112] In one of the earliest Court of Chancery decision to discuss the fiduciary duties of directors, Chancellor Charles M. Curtis wrote:

---

[111] *Stewart v. Lehigh Val. R. Co.*, 38 N.J.L. 505, 524 (E. & A. 1875). New Jersey remained consistent on that point. *See, e.g., Marr v. Marr*, 73 N.J. Eq. 643, 650–51 (E. & A. 1908); *Gardner v. Butler*, 30 N.J. Eq. 702, 721 (E. & A. 1879).

[112] *Wilmington City Ry. Co. v. People's Ry. Co.*, 47 A. 245, 253 (Del. Ch. 1900).

Throughout the consideration of this case it must be borne in mind that the directors and officers of a corporation are stewards, or trustees, for the stockholders, and their acts are to be tested as such according to the searching, drastic and far–reaching rules of conduct which experience has found to be salutary to protect the trust beneficiaries.[113]

He relied on the following statement of law from a decision issued by the United States District Court for the District of Delaware:

The duties of a director or other officer of a corporation in transactions where he is representing his company are governed by well-established and familiar rules of equity. A director of a corporation may freely purchase its stock, and occupies no relation of trust to an individual stockholder . . . . He is not accountable to the stockholder for withholding information from him which affects the value of the stock, but to the corporation, the whole body of stockholders, he stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from the coshareholders.[114]

---

[113] *Cahall v. Lofland*, 114 A. 224, 228 (Del. Ch. 1921), *aff'd*, 118 A. 1 (Del. 1922). Chancellor Curtis served from 1909 to 1921. He previously referenced the fiduciary status of directors, officers, and stockholder controllers in *Martin v. D.B. Martin Co.*, 88 A. 612 (Del. Ch. 1913). His successor, Chancellor Josiah O. Wolcott, served from 1921 until 1938 and was one of Delaware's great jurists. Among Chancellor Wolcott's contributions are several decisions addressing the role of directors as fiduciaries for the stockholders. *See, e.g., Harden v. E. States Pub. Serv. Co.*, 122 A. 705 (Del. Ch. 1923); *Roberts v. Kennedy*, 116 A. 253 (Del. Ch. 1922). Both Chancellors presided during the period after New Jersey adopted the Seven Sisters Acts, which opened the door for Delaware to compete successfully for a major share of the chartering business. *See* Charles M. Yablon, *The Historical Race Competition for Corporate Charters and the Rise and Decline of New Jersey: 1880–1910*, 32 J. Corp. L. 323, 359–67 (2007) (discussing the so-called charter-mongering states that sought to emulate New Jersey and garner out-of-state incorporations, including Delaware, Maine, New York, West Virginia, and South Dakota); Joel Seligman, *A Brief History of Delaware's General Corporation Law of 1899*, 1 Del. J. Corp. L. 249, 270 (1976) (discussing the Seven Sisters Acts). Both Chancellors played major—and today underappreciated—roles in establishing this court's reputation as a venue for corporate cases.

[114] *Du Pont v. Du Pont*, 242 F. 98, 136 (D. Del. 1917), *quoted in Cahall*, 114 A. at 228.

Directors' duties thus ran to the corporation for the ultimate benefit of the "common interests" of the "whole body of stockholders." That meant the firm-specific stockholders in the specific firm that the directors served.

Contemporaneous with these decisions, the Supreme Court of Michigan issued its landmark decision in *Dodge*.[115] That case is both hailed and decried for its plain statement that directors are fiduciaries with an obligation to promote the value of the corporation for the benefit of its stockholders:

> A business corporation is organized and carried on primarily for the profit of the stockholders. The powers of the directors are to be employed for that end. The discretion of directors is to be exercised in the choice of means to attain that end, and does not extend to a change in the end itself, to the reduction of profits, or to the nondistribution of profits among stockholders in order to devote them to other purposes.[116]

When expressing those sentiments, the *Dodge* decision was referring to the interests of stockholders in the Ford Motor Company. The court was not talking about stockholders in any other capacity.

The *Dodge* decision landed ninety years after Chancellor Walworth of New York explained the firm-specific duties of directors. During that time, the firm-specific nature of fiduciary duties had not changed.

---

[115] 170 N.W. 668 (Mich. 1919).

[116] *Id.* at 684.

### c. Consistency After The Rise Of Public Corporations And During The Corporatist Era

Nor did the fiduciary framework change as public corporations came to dominate the landscape. In 1931, Professor Adolf A. Berle, Jr. penned his foundational article., *Corporate Powers As Powers in Trust*, in which he surveyed various areas of the law to support his thesis that "all powers granted to a corporation or to the management of a corporation, or to any group within the corporation, whether derived from statute or charter or both, are necessarily and at all times exercisable only for the ratable benefit of all the shareholders as their interest appears."[117]

As many know, Professor E. Merrick Dodd responded.[118] Importantly, Dodd did not declare that the law had adopted a different fiduciary framework. He acknowledged that under existing law, even for a widely traded company, "[t]he directors and other agents are fiduciaries carrying on the business in the sole interest of the stockholders"[119] and that "it is undoubtedly the traditional view that a corporation is an association of stockholders formed for their private gain and to be managed by its board of directors solely for that end in view."[120] Instead of contending

---

[117] A. A. Berle, Jr., *Corporate Powers As Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[118] E. Merrirck Dodd, *For Whom Are Corporate Managers Trustees?*, 45 Harv. L. Rev. 1145 (1932).

[119] *Id.* at 1146.

[120] *Id.* at 1146–47.

that the fiduciary framework had already changed, he argued against giving "increased emphasis at the present time to the view that business corporations exist for the sole purpose of making profits for their stockholders," and he posited that "public opinion, which ultimately makes law, has made and is today making substantial strides in the direction of a view of the business corporation as an economic institution which has a social service as well as a profit-making function."[121] Looking ahead, he suggested "it may well be that the law is approaching a point of view which will regard all business as affected with a public interest."[122] And he further argued that if public opinion was moving in that direction, then "it is natural to expect that this change of opinion will have some effect upon the attitude of those who manage businesses."[123]

Dodd concluded on the same note:

If we recognize that the attitude of law and public opinion toward business is changing, we may then properly modify our ideas as to the nature of such a business institution as the corporation and hence as to the considerations which may properly influence the conduct of those who direct its activities.[124]

He thus presented an aspirational vision, not a descriptive account.

---

[121] *Id.* at 1148.

[122] *Id.* at 1149.

[123] *Id.* at 1153.

[124] *Id.* at 1163.

Although Berle conceded in 1954 that "[t]he argument has been settled (at least for the time being) squarely in favor of Professor Dodd's contention,"[125] Berle was referring to the change in managerial attitudes that Dodd foretold, not a change in the law. Thus, when acknowledging Dodd's victory, Berle observed that "[t]he greatest leaders in the corporate field . . . . forcefully argue that corporations are always citizens of the community in which they operate" such that "corporations must share the burdens of supporting the non-governmental philanthropic and educational institutions which have played so central a role the development of twentieth-century America."[126] Berle did not concede that the law had changed.

And in Delaware, it had not. In *Guth v. Loft*, a decision issued in 1939, the Delaware Supreme Court held in the context of a private company that directors and officers occupy "position[s] of trust and confidence" such that "[w]hile technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders."[127] The justices used firm-specific language, explaining that an officer or director has an obligation,

> not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or

---

[125] Adolf A. Berle, Jr., *The 20th Century Capitalist Revolution* 169 (1954).

[126] *Id.* at 167–68.

[127] 5 A.2d at 510.

advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.[128]

More than a decade later, in the 1950s, the Delaware Supreme Court viewed the fiduciary status of directors and a stockholder controller as non-controversial.[129] And in 1977, the Delaware Supreme Court emphasized in the context of a public-company squeeze-out that "Delaware courts have long announced and enforced high standards which govern the internal affairs of corporations chartered here, particularly when fiduciary relations are under scrutiny," stating that "[i]t is settled Delaware law, for example, that corporate officers and directors and controlling shareholders owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness."[130]

---

[128] *Id.*; *accord Bovay v. H. M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944).

[129] *Sterling*, 93 A.2d at 109–10; *see Adams v. Clearance Corp.*, 121 A.2d 302, 306 (Del. 1956) ("When an individual stockholder, owing no fiduciary duty to other stockholders, deposits stock in a voting trust, his action is seldom if ever subject to review by the courts; whereas directors so doing are fiduciaries and their action is subject to judicial scrutiny. But their legal power to do so exists."); *see also Baron v. Pressed Metals of Am., Inc.,* 123 A.2d 848, 858 (Del. 1956) (adjudicating claim for breach of fiduciary duty against directors and stockholder controller but affirming rejection of claim on the facts).

[130] *Singer v. Magnavox Co.*, 380 A.2d 969, 976–77 (Del. 1977) (citations omitted), *overruled on other grounds by Weinberger*, 457 A.2d 701. In addition to emphasizing that directors, officers, and stockholder controllers owed and must comply with fiduciary duties, the *Singer* decision adopted the business purpose test. *Singer*, 380 A.2d at 979 ("We hold the law to be that a Delaware Court will not be indifferent to the purpose of a merger when a freeze-out of minority stockholders on a cash-out basis is alleged to be its sole purpose. In such a situation, if it is alleged that the purpose is improper because of the fiduciary obligation owed to the minority, the Court is duty-bound to closely examine that allegation even when all of the relevant statutory formalities have been satisfied."). Earlier that year, the Supreme Court of the United States had provided a not-too-subtle hint that although the federal courts would not be allowed to turn Rule 10b-5 into a simulacrum of corporate law, the legitimacy of Delaware's corporate law remained under scrutiny. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479–80 (1977) ("There may well be a need for uniform fiduciary standards to govern mergers such as that challenged in this complaint. But those standards

All of the fiduciary language contemplated duties running to the stockholders in the specific firm that the fiduciaries served, not to stockholders as diversified investors. Thus, even during the managerialist era, when imperial CEOs strode the earth and viewed themselves as protectors of the communities in which they operated, fiduciary duties continued to have a firm-specific focus.

### d.    The Takeover Era And Current Delaware Law

During the 1980s, the takeover wars forced the Delaware Supreme Court to grapple directly with the proper orientation of directors' fiduciary duties. As this decision has already explained, the landmark opinions in *Unocal* and *Revlon* made clear that directors' duties run to the specific corporation they serve for the ultimate benefit of its stockholders. The Delaware Supreme Court thus reaffirmed and underscored its adoption of the single-firm model.

Today, that model still holds. Directors owe fiduciary duties to the corporation and its stockholders, meaning the class of stockholders who, in the aggregate, hold the residual claim to the value represented by the specific corporation that issued

should not be supplied by judicial extension of s 10(b) and Rule 10b-5 to 'cover the corporate universe.'" (quoting William L. Cary, *Federalism and Corporate Law: Reflections Upon Delaware,* 83 Yale L. J. 663, 700 (1974) (article by then-Chairman of the SEC criticizing Delaware law and arguing for minimum federal law standards to govern companies doing business in interstate commerce))). The *Sante Fe* decision took pains to note that "some states apparently require a 'valid corporate purpose' for the elimination of the minority interest through a short-form merger." *Id.* at 479 n.16. The business purpose test proved relatively unworkable, and in *Weinberger*, the Delaware Supreme Court overruled it but maintained *Singer's* revitalized fiduciary framework. 457 A.2d at 715.

their shares, where the shares represent investments of presumptively permanent capital in a presumptively perpetual firm.[131]

Delaware decisions have long instructed directors to prioritize the long-term value of the corporation.[132] The deep structure of Delaware corporate law explains why. Because a stockholder makes a presumptively permanent investment in a presumptively perpetual firm, the proper orientation of the directors' fiduciary duties

[131] *Hsu*, 2017 WL 1437308, at \*19.

[132] *See, e.g., Gantler*, 965 A.2d at 706 (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[]"); *Trados II*, 73 A.3d at 37 ("A Delaware corporation, by default, has a perpetual existence. Equity capital, by default, is permanent capital . . . . [T]he duty of loyalty therefore mandates that directors maximize the value of the corporation over the long-term for the benefit of the providers of equity capital, as warranted for an entity with perpetual life in which the residual claimants have locked in their investment." (citations omitted)); *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009) ("Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses."); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at \*7 (Del. Ch. Mar. 2, 1989) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"). *See generally* Leo E. Strine, Jr. *Corporate Power Ratchet: The Courts' Role in Eroding "We the People's" Ability to Constrain Our Corporate Creations*, 51 Harv. C.R.-C.L. L. Rev. 423, 440–41 (2016) ("[T]he directors must govern the corporation so as to generate the most sustainable profitability for the corporation's equity owners."); Leo E. Strine, Jr., *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, 50 Wake Forest L. Rev. 761, 777 n.58 (2015) ("Promoting long-term corporate profitability is aligned with an outlook that is focused on maximizing shareholder welfare."); Andrew A. Schwartz, *The Perpetual Corporation*, 80 G. Wash. L. Rev. 764, 777–83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the *protection of long-term value of capital* committed indefinitely to the firm.").

is toward maximizing the value of the firm over a long-term investment horizon.[133]

These features mean the corporation is "uniquely designed for extreme long-term capital allocation."[134]

Notable, the duty to maximize long-term value for firm-specific residual claimants does not inherently mean acting to ensure the corporation's perpetual existence.

> A fiduciary might readily determine that a near-term sale or other shorter-horizon initiative, such as declaring a dividend, is value-maximizing even when judged against the long-term. A trade bidder with access to synergies, for example, may offer a price for a corporation beyond what its standalone value could support. Or fiduciaries might conclude that continuing to manage the corporation for the long-term would be value destroying because of external market forces or other factors. The directors who managed the proverbial maker of horse-and-buggy whips would have acted loyally by selling to a competitor before the new-fangled horseless carriage caught on. [135]

---

[133] *Hsu*, 2017 WL 1437308, at *19; *accord Trados II*, 73 A.3d at 37–41; *see also Zuckerberg*, 262 A.3d at 1062 & n.193 ("[H]aving a bias in favor of founder-control does not mean that Hastings lacks independence from Zuckerberg. Hastings might have a good-faith belief that founder control maximizes a corporation's value over the long-haul. If so, that good-faith belief would play a valid role in Hasting's exercise of his impartial business judgment." (citing *Hsu*, 2017 WL 1437308, at *18)).

[134] Zachary J. Gubler, *The Neoclassical View of Corporate Fiduciary Duty Law*, 91 U. Chi. L. Rev. 165, 203 (2024). As Professor Gubler shows, the perpetual entity model—unique among theories of the corporation—fits the observable statutory features and common law rules, and it correctly describes the corporation as a presumptively perpetual entity. *See generally id.* at 198–224 (explaining the perpetual entity model of the corporation). After conducting his detailed analysis, Professor Gubler observes, "[n]or is one likely to find significant opposition from the Delaware courts" to viewing corporations using the perpetual entity model. *Id.* at 222. That is an understatement. I will go one step further: The perpetual entity model is how Delaware law has traditionally viewed corporations.

[135] *Hsu*, 2017 WL 1437308, at *19; *see Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 791 n.60 (Del. Ch. 2004) (noting in the context of a distressed entity that "[t]he maximization of the economic value of the firm might . . . require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm

"[D]irectors, generally, are obliged to chart a course for a corporation which is in its best interests without regard to a fixed investment horizon."[136] Sometimes, the highest long-term value can be achieved in the short term. Directors have the power to make those decisions.

Equally important, the fiduciary obligation to consider the best interests of stockholders as residual claimants in a presumptively perpetual firm does not prevent the directors from considering the interests of other types of investors, including other types of stockholders. It simply means that the directors must consider those interests instrumentally, just as the directors can consider the interests of other stakeholders instrumentally.

The *Airgas* case provides the prototypical example. There, the Delaware Court of Chancery held that directors properly considered the threat that merger arbitrageurs posed to the best interest of the corporation and its stockholders.[137] The directors proved that they reasonably believed that if the corporation redeemed its rights plan, then the arbitrageurs could rush to secure a quick profit by tendering into a premium offer, even though the offer was below the directors' good faith assessment of the long-term value of the corporation, and notwithstanding the

---

as a going concern would be value-destroying" such that "the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced"); *see also Credit Lyonnais*, 1991 WL 277613, at *34 n.55 (explaining that directors of a distressed corporation have discretion to follow a conservative course to preserve value for creditors).

[136] *Time*, 571 A.2d at 1150.

[137] 16 A.3d at 57.

directors' recommendation against the offer. The directors could therefore properly keep the rights plan in place, contrary to the wishes of a subset of the stockholder base, because the directors had a good faith belief, formed after reasonable investigation, that the bid was inadequate relative to the long-term value of the firm.[138]

The Delaware Supreme Court's decision in *Unitrin* makes the same point.[139] There, a target board adopted a combination of defensive measures that enabled the corporation to remain independent and pursue its business plan for the benefit of long-term investors. The justices explained that when determining what actions will serve the best interests of the corporation and all of its stockholders, "distinctions among types of shareholders are neither inappropriate nor irrelevant for a board of directors to make, *e.g.,* distinctions between long-term shareholders and short-term profit-takers, such as arbitrageurs, and their stockholding objectives."[140] Applying enhanced scrutiny, the justices held that the target board acted reasonably by recognizing that "all shareholders are not alike" and implementing a repurchase program to provide "immediate liquidity to those shareholders who wanted it."[141] As

---

[138] *Id.* at 58.

[139] 651 A.2d 1361.

[140] *Id.* at 1386.

[141] *Id.* at 1389.

71

in *Airgas*, the directors considered and properly responded to the distinct interests of particular investors, who in those decisions posed a threat to the corporation.

Last, in *Gilbert v. El Paso Co.*,[142] a target company board of directors recommended against a third-party tender offer, but holders of 51.8% of the outstanding shares nevertheless tendered. After efforts to secure a higher bid proved unavailing, the directors negotiated with the acquirer to terminate the original offer and structure a new offer at the same price into which all stockholders could tender. The plaintiffs sued, contending that the directors negotiated the new offer selfishly so that they could tender their own shares and that in doing so, they breached their duties to the stockholders who had tendered their shares in the first offer. The Delaware Supreme Court rejected that argument, holding that "[i]n attempting to fulfill their fiduciary duties to the shareholders, directors may have to make difficult decisions involving the competing interests of various shareholder groups."[143] Applying the *Unocal* standard, the high court concluded that the directors reasonably sought to fulfill "their duty to the corporation and all of its shareholders" by properly seeking to "enable all El Paso shareholders to tender their shares" and by securing benefits for "El Paso and *all* its shareholders."[144] Once again, the directors' fiduciary duties ran to the corporation and all of its stockholders, but when pursuing those

---

[142] 575 A.2d 1131 (Del. 1990).

[143] *Id.* at 1147.

[144] *Id.* at 1148.

duties, the directors could consider instrumentally the interests of other groups, including particular groups of stockholders.

The fiduciary duties owed by directors of a Delaware corporation require the directors to seek to maximize the value of the corporation over the long-term for the benefit of the stockholders as residual claimants to the value created by the specific firm that the directors serve. It does not mean striving to maximize value for diversified investors who own equity investments across all firms.

## B. The Plaintiff's Argument For Changing The Law

This decision has shown that Delaware law does not currently follow a diversified-investor approach. Undaunted, the plaintiff argues that Delaware law should change. That argument has no chance in this court, given the existence of binding Delaware Supreme Court opinions that rest on the single-firm model. The plaintiff's argument is also unpersuasive in its own right.

### 1. An Unpersuasive Caricature

When arguing to change the law, the plaintiff starts on the wrong foot with a caricature of what the single-firm focus requires. According to the plaintiff, a single-firm orientation means that "fiduciaries have no duty (or ability) to consider the costs of their decisions on the typical stockholders' portfolios, even if those costs far outweigh any benefit received as holders of company shares."[145] That is not true. Directors must seek to maximize the value of the firm for the ultimate benefit of its

---

[145] PAB 18.

stockholders. That can involve considering a broad spectrum of issues, including how a decision affects stakeholders, the economy, and society. Directors who cause their corporation to become a pariah because its actions consistently or profoundly harm the broader economy will not be able to create durable long-term value for firm-specific stockholders. Directors can and should consider those issues when making decisions about what will promote the value of the firm over the long-term.

## 2. The Unpersuasive Authorities

Moving on to the authorities that the plaintiff cites, the section of the plaintiff's brief that argues for changing the law references only four. Each asserts that *diversified institutional investors* should prioritize market returns over individual company returns.[146] None argue that *directors themselves* have a duty to maximize the returns of diversified investors over individual company returns.

---

[146] *See* PAB 33–34 (citing Jeffrey N. Gordon, *Systematic Stewardship*, 47 J. Corp. L. 627, 631 (2022) (noting diversified investor "may regard its risk-adjusted returns as enhanced rather than reduced by measures that reduce expected returns on a portion of its portfolio"); Freshfields Bruckhaus Deringer, *A Legal Framework for Impact: Sustainability Impact in Investor Decision-Making* 122 (2021) (stating that "[t]he more diversified a portfolio, the less logical it may be to engage in stewardship to secure enterprise specific value protection or enhancement"); John C. Coffee, Jr., *The Coming Shift in Shareholder Activism: From "Firm-Specific" to "Systematic Risk" Proxy Campaigns (and How to Enable them)*, 16 Brook. J. Corp. Fin. & Com. L. 45, 46–47 (2021) (noting that because "change at one firm can affect the value of other firms in the portfolio," activism will seek "to engineer a net gain for the portfolio, possibly by reducing 'negative externalities' that one firm is imposing on other firms in the investor's portfolio"); Principles for Resp. Inv., *Active Ownership 2.0: The Evolution Stewardship Urgently Needs* 5 (2019) (explaining risk of "[a] company strengthening its position by externalising [sic] costs onto others" and noting that "[t]he net result for the [diversified] investor can be negative when the costs across the rest of the portfolio (or market/economy) outweigh the gains to the company")).

The first two authorities were written for investment funds. They do not discuss the duties of corporate directors.[147] They need not be considered further.

The other two authorities are law review articles that at least discuss director duties, but not at the level of arguing for duties to diversified investors. In the first article, Professor Jeffrey Gordon argues that investors should exercise their stockholder-level rights on a portfolio basis.[148] He then explains why the business judgment rule would protect directors who made business decisions consistent with a portfolio-based investment model.[149] He does not contend that director fiduciary duties flow towards diversified investors, nor that they should. He only argues that institutional investors should use their rights to encourage directors to act as if they were, and that the law is sufficiently flexible that directors will not be held liable if they comply.

The other law review article is by Professor Jack Coffee.[150] He makes the same general points as Professor Gordon, then adds that exculpatory provisions will protect disinterested and independent directors who follow a diversified-investor model and can provide credible rationales for their decisions.[151]

---

[147] Principles for Resp. Inv., *Active Ownership 2.0, supra*; Freshfields, *Legal Framework for Impact, supra*.

[148] *See* Gordan, *Systematic Stewardship, supra*, at 648–52.

[149] *Id.* at 666–70.

[150] Coffee, *The Coming Shift in Shareholder Activism, supra*, at 59–61.

[151] *Id.* at 65–67.

There are, however, additional authorities that the plaintiff cites elsewhere in his brief, and those authorities sometimes cite still more authorities. To steelman the plaintiff's argument, this decision examines them.

First, the plaintiff cites *The Economic Structure of Corporate Law* by Frank Easterbrook and Daniel Fischel.[152] Published in 1991, the authors advance a book-length argument for reconceiving corporate law to fit the premises of the law-and-economics movement. Like other scholars from that movement, they assume that legal rules should be evaluated from the perspective of diversified investors. Thus, they argue that,

> the investor wants to maximize the value of his holdings, not the value of a given stock. Whenever there is a question about the apportionment of gain, the investor prefers whatever rule maximizes the net gain to be had—which means increasing the probability of a gain-producing transaction and reducing the costs of realizing each gain. The rules for dealing with gain-creating opportunities will be established before any particular opportunity is in sight, and so each investor will prefer the set of rules that maximizes the total value (wealth) enjoyed by investors, without regard to how the return is shared among corporations.[153]

They also anticipate the plaintiff's argument that "[a] person who holds a diversified portfolio has an investment in the economy as a whole and therefore wants whatever social or private governance rules maximize the value of all firms put together. He is

---

[152] *See* PAB at 35 (citing Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* (1991)).

[153] *Id.* at 28.

not interested in maximizing one firm's value if that comes out of the hide of some other corporation."[154]

Easterbrook and Fischel do not cite any law to support those premises. They proffer them as assertions of fact that are really assumptions. Based on those assumptions, they critique corporate law rules that fail to fulfill their expectations. Tellingly, they claim that "[a]ny attempt to set fair prices for corporate control transactions, in the name of protecting investors who chose not to diversify, penalizes other investors who eliminate risk through diversification, and in the process it reduces the number of value-increasing control transactions."[155] That assertion is part of a larger project to limit litigation, which they view as costly, ineffective, and a drag on value-promoting transactions. They do not argue that diversified investors should be the proper object of fiduciary duties. They rather argue that a fiduciary claim should not exist as long as all stockholders are at least as well off as they were before the transaction, with equivalency determined by market prices. As they admit, "[t]his is really nothing more than an application of the Pareto principle of welfare economics."[156] That is a quite different than either the model Delaware law currently employs or the model the plaintiff wants.

---

[154] *Id.* at 29.

[155] *Id.* at 122–23.

[156] *Id.* at 124–26.

Second, the plaintiff elsewhere cites a 2007 article by Professor Gregory Crespi.[157] That article compares the norm of fiduciary accountability to a fictional undiversified stockholder (the firm-specific model) with four different alternatives: a fictional diversified stockholder model, a fictional equity-only diversified stockholder model, a fictional corporation-specific diversified stockholder model, and combinations of those options. Like the plaintiff, Professor Crespi uses the word "shareholder" as a basis to debate "who exactly is the 'shareholder' to whom [directors] hold themselves accountable."[158] Without analyzing any cases, Professor Crespi claims that "the law does not impose any particular definition of this hypothetical shareholder, which leaves directors with the discretion to choose among a wide range of possible fictional shareholder characterizations to guide them in their investment decisions."[159] Professor Crespi favors a fictional diversified shareholder model,[160] but not the plaintiff's version. In Professor Crespi's parlance, the plaintiff advocates for the interests of fictional equity-only diversified shareholders, which the author views as the second-best alternative.[161]

---

[157] *See* PAB at 27–28 (citing Gregory Scott Crespi, *Maximizing the Wealth of Fictional Shareholders: Which Fiction Should Directors Embrace?*, 32 J. Corp. L. 381 (2007)).

[158] *Id.* at 383.

[159] *Id.* at 384.

[160] *Id.* at 400–01.

[161] *Id.*

Professor Crespi identifies several other articles that engage with the diversified-investor model, and although the plaintiff does not rely on or discuss them, a fair presentation of the plaintiff's argument should take them into account. In a 1990 article, Professor Henry Hu acknowledged that the single-firm model embodied the "classic fiduciary principle,"[162] then argued for shifting to a diversified-investor model (but not an equity-only model), at least for public corporations with few constraints on diversification.[163] Like Professor Crespi, Professor Hu did not argue legal bases for that shift. In the second article published the following year, Professor Hu revisited those concepts, acknowledged again that the single-firm model represented the existing rule,[164] then retracted his earlier endorsement of the diversified-investor model.[165]

Professor Crespi also cited an article by Professor Daniel Greenwood.[166] He too acknowledged that the law currently operates using a single-firm model.[167] But while Professor Greenwood criticized that concept, he argued instead for directors to

[162] Henry T.C. Hu, *Risk, Time, and Fiduciary Principles in Corporate Investment*, 38 UCLA L. Rev. 277, 282 (1990).

[163] *Id.* at 361–66.

[164] Henry T.C. Hu, *New Financial Products, the Modern Process of Financial Innovation, and the Puzzle of Shareholder Welfare*, 69 Tex. L. Rev. 1273, 1277–79 (1991).

[165] *Id.* at 1317.

[166] Daniel J.H. Greenwood, *Fictional Shareholders: For Whom are Corporate Managers Trustees, Revisited*, 69 S. Cal. L. Rev. 1021 (1996).

[167] *Id.* at 1056–89.

consider overall investor welfare, including non-financial considerations.[168] He thus took the argument for change in a different direction than the plaintiff.

Third, and perhaps most strikingly, the plaintiff elsewhere cites an article by Professor Richard Booth for the propositions that "[r]ational investors diversify" and that "most commentators have naturally assumed that fiduciary duty should be construed as if owed to a diversified stockholder."[169] But Booth argues against the plaintiff's proposal.[170] After comparing the single-firm model with a diversified-investor model, he comes out in favor of the single-firm model.[171] In reaching that conclusion, he cites the difficulties involved in making decisions based on the interests of diversified stockholders[172] and the evident stockholder preference for

---

[168] *Id.* at 1098–1104.

[169] Richard A. Booth, *Stockholders, Stakeholders, and Bagholders (or How Investor Diversification Affects Fiduciary Duty)*, 53 Bus. Law. 429, 430 (1998).

[170] *Id.* at 434–35 ("[T]he classical formulation of management duty is in fact the correct view. Management duty should be thought of as owed to an undiversified stockholder and thus owed to the corporation.").

[171] *Id.* at 455–56.

[172] *Id.* at 447–48 ("To derive the rules of management duty from the interests of diversified shareholders would be quite impractical. It would require management to consider the effect of its decisions on the value of its stock in the context of a portfolio. That is, management would need to consider the wealth effect of business decisions in terms of their fit with all other stocks in the portfolio. And quite aside from the burden involved in doing so, the stock in question may be held in many different portfolios with many different goals. Which portfolio strategy should be favored? Judging management decisions by reference to a diversified stockholder imports potentially conflicting duties similar to those which arise under other-constituency statutes. On the other hand, even if investors hold differing portfolios reflecting differing strategies, they all still have the common goal of eliminating company-specific risk. Thus, even if some decisions would favor certain portfolios over others, management could nonetheless pursue the highest possible risk-adjusted return.").

pure-play firms and against conglomerates.[173] He observes that "diversified stockholders, who are supposedly risk-neutral, prefer management to behave as if they were not risk-neutral."[174] He concludes that the single-firm model of fiduciary duties "makes sense even if in fact a given corporation's stock is owned predominantly by diversified shareholders."[175]

Meanwhile, the plaintiff does not address compelling counterarguments to a diversified-investor model. An important article by Professors Marcel Kahan and Edward Rock explains that orienting fiduciary duties toward diversified investors creates pathologies of its own.[176] They refer to the diversified-investor model as a form of "welfarism," which

> rejects the faith that market forces will promote general welfare and lacks confidence in the government's ability to set proper boundary constraints. Because it rejects these underpinnings of shareholderism, it also departs from the focus that shareholderism places on firm value. Instead, it embraces a corporate purpose that includes objectives that are extraneous to the corporation. As the political system has proven itself ineffective in addressing major social problems, welfarism thus looks to corporations to internalize externalities, and promote social welfare, directly.[177]

---

[173] *Id.* at 451 ("Stockholders appear to have a strong preference for management which focuses on the task at hand.").

[174] *Id.* at 453.

[175] *Id.* at 456.

[176] Marcel Kahan & Edward Rock, *Corporate Governance Welfarism*, 15 J. Legal Analysis 108 (2023).

[177] *Id.* at 110.

81

They identify three strands of welfarism: portfolio welfarism, shareholder welfarism, and direct social welfarism.[178] The plaintiff's diversified-investor model is a form of portfolio welfarism, endorsed by the Shareholder Commons, which argues that highly diversified investors should "adopt stewardship practices designed to curtail corporate activities that externalize social and environmental costs that are likely to decrease the returns of portfolios that are diversified in accordance with portfolio theory, even if such curtailment could decrease returns at the externalizing company."[179]

> But as Kahan and Rock explain, portfolio welfarism has "a dark side."[180]

> Intra-portfolio externalities do not always align with social externalities. Consider, as an example, externalities among competing firms. By raising output, a firm may harm its competitors. While doing so may maximize the value of the firm, it may reduce the value of a portfolio held by an owner with stakes in the firm's competitors. If competing companies took account of intra-portfolio externalities by, for example, lowering output and raising prices, portfolio values may increase—but, in this case, social welfare would decline.[181]

Welfarism also has to confront the same lack of consensus about the proper responses to social and economic problems that inhibits political solutions. "[I]f we, as citizens and voters in political elections, cannot generate effective political solutions [to social and economic problems], why would we, as shareholders and voters in corporate

---

[178] *Id.*

[179] *Id.* at 111.

[180] *Id.*

[181] *Id.* (citation omitted).

elections, be more successful in inducing companies to create solutions at the firm level?"[182] The lack of consensus also creates political vulnerability.

> While supporters of welfarism may point to the government's inability to adopt regulations like a carbon tax as evidence of political dysfunction, opponents may view that failure as the outcome of a functioning democratic process and view some forms of welfarism as 'woke capitalism.' The very lack of political consensus for substantive solutions will thus also reduce political support for welfarism.[183]

In short, the diversified-stockholder model is not a panacea. It too generates tradeoffs.

Taken as a whole, the plaintiff's authorities fail to provide sufficient support for changing the law that has governed corporations for two centuries and, during that time, generated unparalleled economic prosperity. At most, the plaintiff has shown that (i) some stakeholder advocates think it would be a better world if directors' duties ran to diversified owners and (ii) some scholars assume that fiduciary duties operate in that fashion. But there are other voices who raise serious questions about the benefits of the diversified-investor model. The plaintiff has not made a convincing case that fiduciary duties should run to diversified investors.

### 3.    The Problem Of Externalities

The plaintiff's strongest argument in favor of the diversified investor model rests not on legal authorities, but rather on his assertion that the single-firm model is more likely to generate negative externalities. That is a serious concern. Delaware

---

[182] *Id.* at 123.

[183] *Id.* at 123–24.

law is not blind to externalities. Nor should anyone be. The real question is how best to address them.

Former Chief Justice Strine spoke to those issues in a pair of important articles.[184] In the first, published in 2012, then-Chancellor Strine explained that he found perplexing "the continuing dismay evidenced in Western, capitalist nations when public corporations that pursue profit for their stockholders take actions that adversely affect the nation's economic stability, the corporation's employees, or the environment."[185] He specifically identified problems of the sort the plaintiff highlights in this case:

> When a corporation's ardor for profits leads it to take excessive risks that endanger the firm's solvency, commentators react with shock and dismay. How can corporate managers be so blinded by the immediate prospect of profit that they would ignore what, in hindsight, seem like such obvious risks? Likewise, we rent our garments in anger and chagrin when energy companies take environmental shortcuts in drilling for oil or mining coal, surprised that profit-maximizing firms have been less than optimally protective of the environment and their

---

[184] Strine, *Dangers of Denial*, *supra*; Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For-Profit Corporations Seek Profit*, 47 Wake Forest L. Rev. 135 (2012). Chief Justice Strine has authored other articles making the same point. *See* Leo E. Strine Jr., *The Soviet Constitution Problem in Comparative Corporate Law: Testing the Proposition that European Corporate Law is More Stockholder Focused than U.S. Corporate Law*, 89 S. Cal. L. Rev. 1239, 1249 (2016); ("[U]nder Delaware law . . . directors are required to focus on promoting stockholder welfare."); Leo E. Strine, Jr., *A Job is Not a Hobby: The Judicial Revival of Corporate Paternalism and its Problematic Implications*, 41 J. Corp. L. 71, 107 (2015) ("Delaware case law is clear that the board of directors of a for-profit corporation . . . must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

[185] *Our Continuing Struggle*, *supra*, at 135.

workers, that they did not go beyond what was simply necessary to ensure that regulators allowed them to operate. Similarly, we anguish when the board of a venerable homeland corporate icon reacts receptively to a premium takeover bid from a foreign acquirer. How could the board sell out and undermine the traditional values the firm stands for? It cannot be that the long-term stockholders would put their desire for a one-time, short-term profit ahead of the continued independence of a nationally important institution?[186]

But while expressing sympathy for the sentiments and policy concerns underlying these reactions, he called for society to recognize "that for-profit corporations will seek profit for their stockholders using all legal means available."[187] Rather than inventing theories that envision directors pursuing these goals as part of their fiduciary duties, he called for strong statutes and regulations to address "externality risk and fundamental concerns about appropriate protection of workers and the environment."[188]

In a second article, published in 2015, then-Chief Justice Strine took on "advocates for corporate social responsibility" who "pretend that directors do not have to make stockholder welfare the sole end of corporate governance, within the limits of their legal discretion, under the law of the most important American jurisdiction—Delaware."[189] He stressed that "within the limits of their discretion, directors must

---

[186] *Id.*

[187] *Id.* at 136.

[188] *Id.* at 171.

[189] *Dangers of Denial, supra*, at 763

make stockholder welfare their sole end, and . . . other interests may be taken into consideration only as a means of promoting stockholder welfare."[190] He concluded:

> If we wish to make the corporation more socially responsible, we must do it the proper way. If we believe that other constituencies should be given more protection within corporation law itself, then statutes should be adopted giving those constituencies enforceable rights that they can wield. But a more effective and direct way to protect interests such as the environment, workers, and consumers would be to revive externality regulation.[191]

As Chief Justice Strine recognized, sources of positive law and regulation outside of corporate law offer effective tools for addressing externalities. Corporate law does not.[192]

---

[190] *Id.* at 768.

[191] *Id.*

[192] Since retiring from the bench, Chief Justice Strine has expressed greater solidarity with the reformers who seek to address externalities and other social problems using corporate law. For example, in an article from 2021, Chief Justice Strine observed that the past four decades have witnessed "wage stagnation, growing inequality, climate change that threatens humanity, repeated bailouts by the many of the few, consumer exploitation, and increased insecurity, social division, and racial and economic inequality." Strine, *Restoration*, *supra*, at 399. He also noted that "the current power allocation legs economic elite use corporate power to decrease the effectiveness of the political process to protect corporate stakeholders." *Id.* Given that reality, he argued that the solution must "address the power and purpose dynamics within corporate governance so that they align better with the outcomes we want for our society's well-being and equity." *Id.*; *accord id.* at 423 ("With these corporate power dynamics making external regulation to protect society and corporate stakeholders much less effective and realistic, it seems to me natural and not at all surprising that advocates for workers, consumers, and the environment would begin to demand reforms to corporate law itself."). While agreeing that Delaware law currently follows the single-firm model, *id.* at 401–05, the Chief Justice alluded favorably to the benefits of orienting corporate law towards the interests of diversified investors, *id.* at 407–11. But in terms of concrete responses, the Chief Justice proposed that directors using their wide discretion under the business judgment rule "to govern the firm in a manner that is respectful of all stakeholders, so long as in doing so, the directors eek to advance the interests of the stockholders as well." *Id.* at 424. He also called for wider and more extensive use of public benefit corporations. *Id.* at 428–33. In another article issued that same year, the Chief Justice and his co-authors endorsed the possibility of a federal mandate under which publicly traded corporations would

In addition to his extra-judicial writings on these topics, the Chief Justice made clear—originally while serving on this court—that directors cannot permit the corporations they serve to ignore externality regulation in the pursuit of greater profit. As he famously wrote, "Delaware law does not charter law breakers."[193] The ability of corporations to pursue profit is "subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'"[194]

By imposing that statutory floor, Delaware law squarely rejects the Chicago School concept of "law as price."[195] That concept posits that a firm may "find it advantageous to violate a law deliberately and pay the penalty for the same reason that an individual in some cases may prefer to breach a contract and pay damages. Because the gains from breach or violation presumably exceed the social costs (as reflected in the penalty), compliance with the statute or contract is undesirable from a personal as well as a social perspective."[196] From that perspective, "[m]anagers have

become Delaware public benefit corporations under a worker co-determination model. Leo E. Strine, Jr., Aneil Kovvali, & Oluwatomi O. Williams, *Lifting Labor's Voice: A Principled Path Toward Greater Worker Voice and Power Within American Corporate Governance*, 106 Minn. L. rev. 1325, 1381–82 (2021). The Chief Justice and his co-authors did not argue for changing the traditional fiduciary orientation of corporate law.

[193] *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 21, 2011). *See generally* Asaf Raz, *The Legal Primacy Norm*, 74 Fla. L. Rev. 933 (2022).

[194] *Id.*

[195] *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1207 (Del. Ch. 2022).

[196] Daniel R. Fischel, *The Corporate Governance Movement*, 35 Vand. L. Rev. 1259, 1271 (1982).

no general obligation to avoid violating regulatory laws, when violations are profitable to the firm."[197] Stated more broadly,

> managers do not have an ethical duty to obey economic regulatory laws just because the laws exist. They must determine the importance of these laws. The penalties Congress names for disobedience are a measure of how much it wants firms to sacrifice in order to adhere to the rules; the idea of optimal sanctions is based on the supposition that managers not only may but also should violate the rules when it is profitable to do so.[198]

A proponent of an extreme version of law as price could argue with a straight face that fiduciaries have an obligation to breach the law if, by doing so, they can maximize profits for stockholders.[199]

Delaware law stands for precisely the opposite proposition. "[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[200] Arguing law as price and equating positive laws with contracts might still get a passing grade in an economics course. It gets an F in a class on Delaware corporate law.

---

[197] Frank H. Easterbrook & Daniel R. Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 Mich. L. Rev. 1155, 1168 n.36 (1982)

[198] *Id*. at 1177 n.57.

[199] *See* David L. Engel, *An Approach to Corporate Social Responsibility*, 32 Stan. L. Rev. 1, 34–55 (1979) (arguing that corporations can and should maximize profits by factoring in the cost of regulatory and legal sanctions discounted by likelihood of detection and successful enforcement). *See generally* Cynthia A. Williams, *Corporate Compliance With the Law In the Era of Efficiency*, 76 N.C. L. Rev. 1265, 1285–1300 (1998) (collecting and summarizing authorities endorsing the view of "law as price").

[200] *Massey*, 2011 WL 2176479, at *20.

By explicitly rejecting the notion that a board of directors can act loyally when consciously deciding to violate positive law in pursuit of greater profits, Delaware ensures that positive laws and regulations have bite. Through those laws and regulations, governments can impose meaningful restrictions on externalities. Through its corporate law, Delaware supports those efforts.

It is frankly difficult for Delaware to use corporate law to do more. Reformers who look to Delaware law to address externalities must acknowledge the larger political environment.[201] Delaware is one of fifty states, each of which can offer entities embodying different corporate law packages. Delaware is not California. Among the fifty states, Delaware has one of the smaller human populations (only around one million souls), one of the smallest geographical areas (albeit conveniently located), and a relatively small economy (though mighty in spirit). Delaware does not have the market power to force anyone to use its corporations, its law, or its courts. Delaware must identify niches where it has a comparative advantage—like corporate law—so that entrepreneurs want to use its corporations, legal practitioners want to choose its law, and parties want to litigate in its courts.

---

[201] *See* Mark J. Roe, *Political Determinants of Corporate Governance* 1 (2003) ("[P]olitics can affect a firm in many ways: it can determine who owns it, how big it can grow, what it can produce profitably, how it raises capital, who has the capital to invest, how managers and employees see themselves and one another, and how authority is distributed inside the firm . . . .").

Delaware has traditionally filled the corporate law niche by taking a distinctively nonpartisan, technocratic approach.[202] Delaware seeks to supply corporate practitioners with a flexible legal framework, broadly enabling in character but subject to some mandatory floors, that gives managers (framed broadly) expansive discretion to take risks and pursue profit, while at the same time protecting the legitimate rights and expectations of investors.

Delaware has not used its corporate law to address hot-button social issues or to intervene in societal debates. Depending on an observer's political leanings, there are any number of salient issues that Delaware might use its corporate law to address. But to the extent the General Assembly sought to intervene on any of them, entrepreneurs who did not like the answer could incorporate their firms elsewhere. Strong externality regulation is just one example. If the General Assembly sought to make Delaware the externality regulatory for the country (or the world), corporations who did not agree could readily opt out.

The lesson is a broader one. State-based corporate law in general, and Delaware law in particular, is a poor vehicle for addressing externalities. Delaware law mandates that its entities and the fiduciaries who manage them comply with positive law. That legal requirement promotes legal compliance in its own right, while also providing a mechanism for holding fiduciaries accountable when they knowingly

---

[202] Ofer Eldar & Gabriel Rauterberg, *Is Corporate Law Nonpartisan?,* 2023 Wis. L. Rev. 177, 181 (2023)

cause an entity to violate positive law. To ask more from state-based corporate law is to pick the wrong took for the job.

In the end, the plaintiff paints a Panglossian ideal of a world without externalities. I would like to live in that world. But this lawsuit is not the right vehicle for creating that future or for making the trip.

### 4. The Availability Of Private Ordering Solutions

As this decision has demonstrated, the plaintiff asks this court to upset decades of corporate law by holding that all Delaware corporations, or at least all systemically significant corporations, must be managed for the benefit of diversified investors. That is a bold ask by any measure, and it is particularly unwarranted given that Delaware law already permits corporations to opt into that model through private ordering. To the extent corporations find the plaintiff's arguments persuasive, they can implement the plaintiff's framework.

### a. Section 102(a)(3) And A Limited Purpose Clause

"[One] way the DGCL permits corporate planners to tailor the powers of corporate fiduciaries and the duties they owe is through a limited purpose clause."[203] Delaware law does not use the term "purpose" to refer to the proper orientation of directors' duties. Fiduciary duties arise in equity and result from the stockholders' entrustment of capital to a firm over which the directors hold virtually plenary authority. Delaware instead uses the term "purpose" to mean the goal that the

---

[203] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 553 (Del. Ch. 2023).

corporation seeks to achieve.[204] In the era of special charters, it might have been to build and operate a toll road, bridge, or iron works.

A corporation's charter must state "[t]he nature of the business or purposes to be conducted or promoted."[205] Delaware law authorizes the certificate of incorporation to provide that "the purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware," with the effect that "all lawful acts and activities shall be within the purposes of the corporation, except for express limitations."[206] Most charters take that approach and do not specify a specific purpose. But special purposes remain, such as only investing in real estate.

As this decision has discussed, corporate directors have an obligation to seek to maximize the long-term value of the corporation for the benefit of its stockholders. Absent a narrow purpose clause, directors have the flexibility to pursue the business they believe to be the value-maximizing option. But if the charter contains a limited purpose clause, then that provision constrains the choice set.[207] Rather than freely

---

[204] *See* Asaf Raz, *A Purpose-Based Theory of Corporate Law*, 65 Vill. L. Rev. 523, 535 (2020) (referring to the charter-defined purpose as the corporation's goals); *see also* George A. Mocsary, *Freedom of Corporate Purpose*, 2016 B.Y.U. L. Rev. 1319, 1364–68 (2017) (discussing the difference between "strategic" and "tactical" corporate purposes, in which the "strategic" purpose reflects the corporation's role in society and "tactical" purposes reflect its specific areas of focus).

[205] 8 *Del. C.* § 102(a)(3).

[206] *Id.*

[207] *Rich*, 295 A.3d at 554. *See JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 787–88 (Del. Ch. 2022) (explaining that narrow purpose clause in partnership agreement

92

seeking to maximize the long-term value of the corporation for the benefit of its stockholders, directors acting loyally must strive in good faith to fulfill their fiduciary duties within the ambit of the narrowly defined purpose. The narrow purpose clause "limits the directors' powers and concomitant duties" by denying the corporation the power to engage in acts outside of a narrowly defined purpose and rendering non-compliant acts void.[208]

Using a narrow purpose clause, corporate planners could create a firm where the directors were constrained to operate in a manner that would not harm diversified investors. For example, a certificate of incorporation might state:

> The purpose of the corporation is to pursue only businesses that benefit diversified equity investors and do not create externalities that benefit the corporation at the expense of the economy as a whole.

With the corporation limited by such a purpose clause, directors could not cause the corporation to pursue lines of business that generated negative externalities that harmed diversified investors. If the directors took action to cause the corporation to

---

constrained ability of general partner to act and with it the general partner's fiduciary duties).

[208] *Rich*, 295 A.3d at 554. *See also* Gabriel Rauterberg & Eric Talley*, Contracting Out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate Opportunity Waivers*. 117 Colum. L. Rev. 1075, 1090 (2017) (explaining that a Delaware corporation could "cabin the breadth of the [corporate opportunity] doctrine by narrowing the purpose articulated in its charter to specified lines of business, effectively using that scope limitation to cabin the reach of all corporate activity"); *cf.* Zenichi Shishido, *Conflicts of Interest and Fiduciary Duties in the Operation of a Joint Venture*, 39 Hastings L.J. 63, 94–95 (1987) (noting that a court cannot find a misappropriation of a corporate opportunity when the opportunity falls outside the scope of the corporation's purposes).

engage in activities that harmed diversified investors, a plaintiff could seek to have their actions declared void.[209]

### b. Section 102(b)(1) And Limitations On Corporate Or Director Power

A second method of fiduciary tailoring involves a charter provision that defines, limits, or regulates the powers of the corporation, directors, and stockholders. Section 102(b)(1) of the DGCL states that a charter may contain:

> Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State.[210]

Nearly seventy years ago, the Delaware Supreme Court explained that Section 102(b)(1) authorizes a charter to include "a provision departing from the rules of the common law, provided that it does not transgress a statutory enactment or a public

---

[209] *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 442 (Del. Ch. 2020) ("[A] corporation retains the ability to introduce uncertainty about its capacity or power by including provisions in its charter that disavow particular powers or forbid the corporation from entering into particular lines of business or engaging in particular acts."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 2.1 (4th ed. & Supp. 2023-1) (explaining the general inapplicability of the *ultra vires* doctrine based on lack of corporate power or capacity, while identifying remaining applications of the doctrine, including a charter provision that forbids the corporation from entering into particular lines of business or engaging in particular acts); *see also Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing *ultra vires* acts and the implications of Section 124 of the DCGL), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016 (rejecting *Carsanaro*'s analysis of post-merger derivative standing).

[210] 8 *Del. C.* § 102(b)(1).

policy settled by the common law or implicit in the [DGCL] itself."[211] Just three years ago, the Delaware Supreme Court emphasized Delaware's "public policy favoring private ordering" and held that Section 102(b)(1) "allows a corporate charter to contain virtually any provision that is related to the corporation's governance," subject only to the requirement that it not be "contrary to the laws of this State."[212]

Section 102(b)(1) explicitly authorizes provisions addressing "the management of the business and for the conduct of the affairs of the corporation." Section 102(b)(1) also explicitly authorizes provisions "defining, limiting and regulating the powers of the corporation [and] the directors." Exercising this authority, corporate planners could orient the management and powers of the corporation to benefit diversified investors. For example, a provision might state:

> The business of the corporation shall be managed for the benefit of diversified investors and the affairs of the corporation shall be conducted to that end. The powers of the corporation and its directors are limited to being exercised solely to promote the welfare of diversified investors.

If a charter contained such a provision, then the directors would have to manage the business and affairs of the corporation in compliance with its terms. The directors would be obligated to comply with the provision, suggesting that their duties would be re-oriented toward diversified investors. To the extent there remained some residual obligation to maximize value for the corporation's firm-specific stockholders,

---

[211] *Sterling*, 93 A.2d at 118.

[212] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1217 (Del. 2021).

the directors could only pursue that obligation by exercising their powers and the powers of the corporation for the benefit of diversified investors.

### c. Section 141(a)(1) And Direct Fiduciary Tailoring

A third method of fiduciary tailoring involves explicitly reorienting the duties of directors. Section 141(a) of the DGCL states:

> The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.[213]

As discussed previously, the board's authority under Section 141(a) provides the foundation for directors' fiduciary duties. It follows that modifying the board's authority under Section 141(a) should modify directors' fiduciary duties.[214]

Structurally, the first sentence of Section 141(a) gives the board nearly plenary authority over the business and affairs of the corporation "except as may be provided otherwise in this chapter or in its certificate of incorporation" (the "Board Power Exception").[215] The Board Power Exception authorizes modifications to the board-centric regime that appear in the DGCL ("in this chapter") or the charter ("in its certificate of incorporation"). The second sentence confirms that if a modification

---

[213] 8 *Del. C.* § 141(a).

[214] *Rich*, 295 A.3d at 555.

[215] *Id.*

appears it the charter, then the board's powers and duties "shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation."[216]

The Board Power Exception treats provisions that appear in the DGCL or in the charter as equally effective for tailoring the board's power and duties. It follows that extant statutory provisions should provide insight into what types of charter-based modifications comport with Delaware public policy and are permissible. For present purposes, the illustrative exemplar appears in Subchapter XV of the DGCL, Public Benefits Corporations, where Section 361 authorizes the charter of a public benefit corporation to identify a public benefit with the effect that the corporation "shall be managed in a manner that balances the stockholders' pecuniary interests, the best interests of those materially affected by the corporation's conduct, and the public benefit or public benefits identified in its certificate of incorporation."[217] The Board Power Exception suggests that a comparable charter provision would be permissible. That in turn opens up a path to re-orient fiduciary duties explicitly.

Using the Board Power Exception, a charter could re-orient the powers and duties of the board of directors toward diversified investors. A provision might state, for example, that "any duties conferred or imposed upon the board of directors of the corporation shall be owed to the corporation for the ultimate benefit of its

---

[216] *Id.* at 555–56.

[217] 8 *Del. C.* § 362(a).

stockholders as diversified investors." Such a provision would seem to shift the directors' duties from firm-specific stockholders to diversified investors.

Like the other two methods of private ordering, the availability of direct fiduciary re-orientation offers the plaintiff a means to achieve his goals. To the extent founders believe that provisions of this type are desirable, they can include them and benefit from a lower cost of capital. To the extent investors believe that provisions of this type are desirable, they can make their desires known and prefer firms whose charters contain them. The existence of those opportunities alleviates the need for Delaware common law to change the orientation of director duties by shifting them away from the single-firm model and toward a diversified-investor model.

## C.     The Plaintiff's Specific Claims For Breach

Based on the assertion that corporate fiduciaries must seek to maximize value for diversified investors, the plaintiff argues that the defendants have breached their duties of loyalty and care. They do not attack any particular decision or transaction *per se.* They rather challenge Meta's entire business model, through which "a conflicted controller and a majority of fiduciaries beholden to him refuse to consider the deleterious effects of their decisions on the Company's diversified stockholders."[218] Because fiduciary duties do not run to diversified investors, none of the theories state claims on which relief can be granted.

---

[218] PAB 52–53.

The plaintiff presents their claim under various frameworks, but in substance, they contend that Zuckerberg and Sandberg face a conflict of interest because the bulk of their wealth is tied up in Meta common stock, which causes their interests to diverge from the interests of Meta's other stockholders in their capacity as diversified investors. They also allege that a sufficient number of directors are beholden to Zuckerberg to deprive the Board of a disinterested and independent majority. And they allege that the directors themselves inferably face conflicts of interest similar to Zuckerberg and Sandberg, because Meta's stock ownership guidelines for outside directors require that Meta directors own at least $750,000 worth of Meta stock.

From this basic theory of conflict, the plaintiff contends that all of the Board's decisions to pursue Meta's business model are subject to review for entire fairness because they served the interests of the defendants as owners of concentrated positions in Meta common stock, rather than the interests of Meta's common stockholders in their capacity as diversified investors. For good measure, they also assert (albeit vaguely) that the defendants have been breaching their duty of care by failing to consider the interests of Meta's common stockholders in their capacity as diversified investors, which likewise triggers entire fairness.

The plaintiff also packages its theory of conflict as an oversight claim. According to the plaintiff, the defendants "violated their duties of care and loyalty when they failed to monitor whether decisions to maximize Company value harmed

typical stockholders harming the value of their diversified portfolios."[219] The plaintiff frames an Information-Systems Claim by arguing that "despite the Company's unparalleled reach, there is no system for monitoring the damage that Meta does to its own investors—or even considering their diversified interests."[220] And the plaintiff frames a Red-Flags Claim by contending that various articles in the *Wall Street Journal* and elsewhere raised myriad red flags about the Company's business model and its effect on the Company's stockholders in their capacities as diversified investors. The plaintiff contends that despite these reports, the directors continue to maintain a governance system that does not include any mechanisms to account for the costs of systemic risks to stockholders in their capacity as diversified investors.

In response, the defendants assert that the complaint "omits any factual allegations that the global GDP has fallen in recent years" and "offers no facts to show how the market as a whole has performed."[221] That misses the point. The plaintiff does not contend that GDP or portfolio values have fallen, but that those values are lower than they otherwise would have been but for the defendants' alleged breaches of duty. The plaintiff also contends that the market does not fully account for the threat that Meta's business model poses.

---

[219] PAB 37.

[220] PAB 38.

[221] DOB 10 n.8.

Similarly, the defendants argue that Meta's stock price has gone up. That response does not grapple with plaintiff's theory. The plaintiff contends that Meta has taken steps to improve its stock price, but that those steps have come at the expense of the economy as a whole and have therefore harmed diversified investors.

The defendants also invoke Meta's exculpatory charter provision, but that is not a viable defense. If the plaintiff were correct, then to the extent that the defendants subjectively pursued the wrong objective, they conceivably acted in bad faith. And to the extent that the directors have acted improperly by taking action that furthered their own interests as firm-specific owners of Meta common stock, then they conceivably acted disloyally. The exculpatory charter provision would not apply to those claims. Nor would it protect Zuckerberg in his capacity as a controlling stockholder.

But the plaintiff's arguments nevertheless fail because the plaintiff is simply wrong that the defendants acted improperly by seeking to promote Meta's value for the benefit of its common stockholders in their firm-specific capacities as long-term investors in Meta. The plaintiff is also wrong that the defendants' concentrated positions in Meta created any conflict. Having lost on the standard of conduct, the plaintiff cannot state any claims.

## III. CONCLUSION

The complaint fails to state any claims on which relief can be granted. Judgment will be entered for the defendants dismissing the case with prejudice.